# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP2003 |

| | |
|---|---|
| COMPLETE TITLE: | Wisconsin Justice Initiative, Inc., a Wisconsin nonstock corporation, Jacqueline E. Boynton, Jerome F. Buting, Craig R. Johnson and Fred A. Risser, |
| | Plaintiffs-Respondents, |
| | v. |
| | Wisconsin Elections Commission, Ann S. Jacobs, in her official capacity as Chair of the Wisconsin Elections Commission, Douglas La Follette, in his official capacity as Secretary of State of Wisconsin, and Josh Kaul, in his official capacity as Attorney General of Wisconsin, |
| | Defendants-Appellants. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | May 16, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 6, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Frank D. Remington |

JUSTICES:

HAGEDORN, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined, and in which DALLET and KAROFSKY, JJ., joined with respect to ¶¶58-59 and 61-65. REBECCA GRASSL BRADLEY, J., filed a concurring opinion in which ZIEGLER, C.J., and ROGGENSACK, J., joined. DALLET, J., filed a concurring opinion in which KAROFSKY, J., joined, and in which ANN WALSH BRADLEY, J., joined with respect to ¶¶93-122. HAGEDORN, J., filed a concurring opinion in which DALLET, J., joined with respect to ¶¶137-150. ANN WALSH BRADLEY, J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the defendants-appellants, there were briefs filed by *Jody J. Schmelzer* and *Hannah S. Jurss*, assistant attorneys general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Hannah S. Jurss*, assistant attorney general.

For the plaintiffs-respondents, there was a brief filed by *Dennis M. Grzezinski* and the *Law Office of Dennis M. Grzezinski*, Milwaukee. There was an oral argument by *Dennis M. Grzezinski*.

An amicus curiae brief was filed by *Mike Wittenwyler, Kendall W. Harrizon, Maxted M. Lenz,* and *Godfrey & Kahn, S.C.,* Madison, for Marsy's Law for Wisconsin, L.L.C., Mothers Against Drunk Driving, Wisconsin Victim/Witness Professionals Association, Wisconsin Chiefs of Police Association, Milwaukee Police Association, Wisconsin Professional Police Association, Bolton Refuge House, Inc., Golden House, Inc., Unidos Against Domestic Violence, New Day Advocacy Center, and Eau Claire Area Hmong Mutual Assistance Association, Inc.

An amicus curiae brief was filed by *Scott E. Rosenow* and *WMC Litigation Center*, Madison, for Wisconsin Manufacturers & Commerce, Inc.

An amicus curiae brief was filed by *Katie R. York*, appellate division director, with whom on the brief was *Kelli S. Thompson,* state public defender, for the Wisconsin State Public Defender.

An amicus curiae brief was filed by *Christine Donahoe, Mel Barnes, Elizabeth M. Pierson, Jeffrey A. Mandell, Douglas M. Poland, Pahoua Thao,* and *Stafford Rosenbaum LLP*, Madison, for the ACLU of Wisconsin and Law Forward, Inc.

2

An amicus curiae brief was filed by *Erika Jacobs Petty,* *Rachel E. Sattler*, and *Lotus Legal Clinic,* Brookfield, for Lotus Legal Clinic.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2020AP2003
(L.C. No.  2019CV3485)

STATE OF WISCONSIN          :       IN SUPREME COURT

**Wisconsin Justice Initiative, Inc., a Wisconsin nonstock corporation, Jacqueline E. Boynton, Jerome F. Buting, Craig R. Johnson and Fred A. Risser,**

       **Plaintiffs-Respondents,**

  **v.**

**Wisconsin Elections Commission, Ann S. Jacobs, in her official capacity as Chair of the Wisconsin Elections Commission, Douglas La Follette, in his official capacity as Secretary of State of Wisconsin, and Josh Kaul, in his official capacity as Attorney General of Wisconsin,**

       **Defendants-Appellants.**

**FILED**

**MAY 16, 2023**

Sheila T. Reiff
Clerk of Supreme Court

---

HAGEDORN, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined, and in which DALLET and KAROFSKY, JJ., joined with respect to ¶¶58-59 and 61-65. REBECCA GRASSL BRADLEY, J., filed a concurring opinion in which ZIEGLER, C.J., and ROGGENSACK, J., joined. DALLET, J., filed a concurring opinion in which KAROFSKY, J., joined, and in which ANN WALSH BRADLEY, J., joined with respect to ¶¶93-122. HAGEDORN, J., filed a concurring opinion in which DALLET, J., joined with respect to ¶¶137-150. ANN WALSH BRADLEY, J., filed a dissenting opinion.

APPEAL from a judgment and an order of the Circuit Court for Dane County, Frank D. Remington, Judge.  *Reversed.*

¶1  BRIAN HAGEDORN, J.  When the Wisconsin Constitution was adopted in 1848, it included a process enabling amendments——an act the people of Wisconsin have seen fit to do almost 150 times.  A proposed amendment must be approved by a majority of both houses of the legislature in two successive legislative sessions.  Wis. Const. art. XII, § 1.  Once it passes that test, the proposed amendment is submitted to the people.  Id.  If a majority vote yes, it becomes part of our constitution.  Id.  A victim's rights amendment termed "Marsy's Law" by its sponsors (a term we also use in this opinion) was ratified by the people in April of 2020.  In this case, Wisconsin Justice Initiative, Inc. and several citizens (collectively "WJI") argue that Marsy's Law was adopted in violation of the process spelled out in the constitution.

¶2  When considering claims grounded in the Wisconsin Constitution, our obligation is to faithfully interpret and apply its original meaning.  The relevant constitutional text governing the claims here is found in Article XII, Section 1.  It provides that the legislature has a duty "to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe."  Wis. Const. art. XII, § 1.  And, "if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately."  Id.

1

¶3 The legislature has prescribed further guidelines via statute regarding the form of the ballot for proposed constitutional amendments. Notably, Wis. Stat. § 5.64(2)(am) (2021-22)[1] requires ballot questions to contain a "concise statement of each question." However, WJI has not raised a challenge based upon this or any other statute. Therefore, this case concerns only the requirements of the Wisconsin Constitution which, by their plain terms, give broad discretion to the legislature to prescribe the manner of submission to the people.

¶4 To that end, WJI argues that the ballot question for Marsy's Law submitted to Wisconsin voters ran afoul of Article XII, Section 1. WJI asserts the ballot question fails to contain "every essential" of the proposed amendment, and that it misled voters in several respects by neglecting the amendment's impact on the rights of criminal defendants. WJI pulls this supposed "every essential" requirement from language, although not the holdings, in two of our prior cases. See State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 204 N.W. 803 (1925); State ex rel. Thomson v. Zimmerman, 264 Wis. 644, 60 N.W.2d 416 (1953). However, not a single constitutional amendment in Wisconsin history has ever undergone judicial review using this ostensible test.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

2

¶5 Examining the original meaning of the Wisconsin Constitution, we discern no such requirement, and therefore we decline the invitation to fashion a new, exacting constitutional standard. The constitution itself requires only that the legislature "submit" the proposed amendment to the people. See Wis. Const. art. XII, § 1. In 1953, we did strike down a proposed amendment in Thomson——the only time we have done so on this basis in Wisconsin history——when we concluded the question submitted to the people described the amendment in a fundamentally counterfactual way. 264 Wis. at 660. The proposed amendment was therefore not, in any meaningful way, "submitted" to the people. Id. However, the extreme situation in Thomson is not present here. While WJI takes issue with the wording, completeness, and implications of the ballot question, we conclude the question was not fundamentally counterfactual such that voters were not afforded the opportunity to approve the actual amendment.

¶6 Additionally, in view of what WJI contends were modifications to the rights of criminal defendants and victims, it argues Marsy's Law should have been submitted to voters as multiple amendments, rather than as a single amendment. We have summarized our interpretation of this portion of Article XII, Section 1 as follows:

> It is within the discretion of the legislature to submit several distinct propositions as one amendment if they relate to the same subject matter and are designed to accomplish one general purpose. The general purpose of an amendment may be deduced from the text of the amendment itself and from the

3

historical context in which the amendment was adopted. And all of the propositions must tend to effect or carry out that purpose.

McConkey v. Van Hollen, 2010 WI 57, ¶50, 326 Wis. 2d 1, 783 N.W.2d 855 (cleaned up). Applying this test, we conclude all of the provisions of Marsy's Law relate to expanding and defining victim's rights and tend to effect and carry out this general purpose.

¶7 We therefore hold that WJI's challenges to Marsy's Law fail. The ballot question was not submitted to the people in violation of the process outlined in the Wisconsin Constitution. Therefore, absent challenge on other grounds, the amendment has been validly ratified and is part of the Wisconsin Constitution.

## I. BACKGROUND

¶8 In successive legislative sessions, both houses of the legislature adopted a proposal to amend Article I, Section 9m of the Wisconsin Constitution. See 2017 Enrolled Joint Resolution 13; 2019 Enrolled Joint Resolution 3. The proposed amendment renumbered the existing Article 1 Section 9m to Section 9m(2) (intro.) and modified it as follows, with underlines representing additions to and strikethroughs representing deletion of the then-existing text:

> [Article I] Section 9m (2) (intro.) ~~This state shall treat crime victims, as defined by law, with fairness, dignity and respect for their privacy. This state shall ensure that crime victims have all of the following privileges and protections as provided by law:~~ In order to preserve and protect victims' rights to justice and due process throughout the criminal and juvenile justice process, victims shall be entitled to

4

all of the following rights, which shall vest at the time of victimization and be protected by law in a manner no less vigorous than the protections afforded to the accused:

(a) To be treated with dignity, respect, courtesy, sensitivity, and fairness.

(b) To privacy.

(c) To proceedings free from unreasonable delay.

(d) To timely disposition of the case; the opportunity to attend court, free from unreasonable delay.

(e) Upon request, to attend all proceedings unless the trial court finds sequestration is necessary to a fair trial for the defendant; involving the case.

(f) To reasonable protection from the accused throughout the criminal and juvenile justice process;.

(g) Upon request, to reasonable and timely notification of court proceedings; the opportunity to.

(h) Upon request, to confer with the prosecution; the opportunity to make a statement to the court at disposition; attorney for the government.

(i) Upon request, to be heard in any proceeding during which a right of the victim is implicated, including release, plea, sentencing, disposition, parole, revocation, expungement, or pardon.

(j) To have information pertaining to the economic, physical, and psychological effect upon the victim of the offense submitted to the authority with jurisdiction over the case and to have that information considered by that authority.

(k) Upon request, to timely notice of any release or escape of the accused or death of the accused if the accused is in custody or on supervision at the time of death.

(L) To refuse an interview, deposition, or other discovery request made by the accused or any person acting on behalf of the accused.

(m) To full restitution~~,~~ from any person who has been ordered to pay restitution to the victim and to be provided with assistance collecting restitution.

(n) To compensation~~, and~~ as provided by law.

(o) Upon request, to reasonable and timely information about the status of the investigation and the outcome of the case ~~and the release of the accused~~.

(p) To timely notice about all rights under this section and all other rights, privileges, or protections of the victim provided by law, including how such rights, privileges, or protections are enforced.

(3) Except as provided under sub. (2) (n), all provisions of this section are self-executing. The legislature ~~shall provide~~ may prescribe further remedies for the violation of this section~~. Nothing in this section, or in any statute enacted pursuant to this section, shall limit any right of the accused which may be provided by law.~~ and further procedures for compliance with and enforcement of this section.

2019 Enrolled Joint Resolution 3, § 1.

¶9 The proposed amendment also created four new subsections:

[Article I] Section 9m (1)(a) In this section, notwithstanding any statutory right, privilege, or protection, "victim" means any of the following:

1. A person against whom an act is committed that would constitute a crime if committed by a competent adult.

2. If the person under subd. 1. is deceased or is physically or emotionally unable to exercise his or her rights under this section, the person's spouse, parent or legal guardian, sibling, child, person who resided with the deceased at the time of death, or other lawful representative.

3. If the person under subd. 1. is a minor, the person's parent, legal guardian or custodian, or other lawful representative.

6

4.  If the person under subd. 1. is adjudicated incompetent, the person's legal guardian or other lawful representative.

(b) "Victim" does not include the accused or a person who the court finds would not act in the best interests of a victim who is deceased, incompetent, a minor, or physically or emotionally unable to exercise his or her rights under this section.

 .  .  .

[Article I] Section 9m (4)(a) In addition to any other available enforcement of rights or remedy for a violation of this section or of other rights, privileges, or protections provided by law, the victim, the victim's attorney or other lawful representative, or the attorney for the government upon request of the victim may assert and seek in any circuit court or before any other authority of competent jurisdiction, enforcement of the rights in this section and any other right, privilege, or protection afforded to the victim by law.  The court or other authority with jurisdiction over the case shall act promptly on such a request and afford a remedy for the violation of any right of the victim. The court or other authority with jurisdiction over the case shall clearly state on the record the reasons for any decision regarding the disposition of a victim's right and shall provide those reasons to the victim or the victim's attorney or other lawful representative.

(b) Victims may obtain review of all adverse decisions concerning their rights as victims by courts or other authorities with jurisdiction under par. (a) by filing petitions for supervisory writ in the court of appeals and supreme court.

 .  .  .

[Article I] Section 9m (5) This section does not create any cause of action for damages against the state; any political subdivision of the state; any officer, employee, or agent of the state or a political subdivision of the state acting in his or her official capacity; or any officer, employee, or

7

agent of the courts acting in his or her official capacity.

. . .

[Article I] Section 9m (6) This section is not intended and may not be interpreted to supersede a defendant's federal constitutional rights or to afford party status in a proceeding to any victim.

Id., §§ 2-5.

¶10 The legislature directed that this amendment, informally known as "Marsy's Law," be submitted for ratification at the April 7, 2020 election. The legislature determined that the ballot question should state as follows:

> Question 1: "Additional rights of crime victims. Shall section 9m of article I of the constitution, which gives certain rights to crime victims, be amended to give crime victims additional rights, to require that the rights of crime victims be protected with equal force to the protections afforded the accused while leaving the federal constitutional rights of the accused intact, and to allow crime victims to enforce their rights in court?"

2019 Enrolled Joint Resolution 3.

¶11 Several months before the April election, WJI brought suit against the Wisconsin Elections Commission (WEC) alleging the ballot question failed to satisfy the requirements of the Wisconsin Constitution.[2] WJI sought declarations that the ballot question violated Article XII, Section 1 of the Wisconsin Constitution on various grounds, and requested both a permanent injunction and a temporary injunction preventing submission of

---

[2] WJI also sued Dean Knudson, Douglas LaFollette, and Josh Kaul in their official capacities as Chair of the WEC, Secretary of State, and Attorney General, respectively. We refer to all the defendants collectively as WEC.

8

the question to voters while the litigation was pending.  The circuit court denied WJI's motion for a temporary injunction, and Wisconsinites ratified the amendment at the April 7, 2020 election by a vote of 1,107,067 to 371,013.  Several months later, the circuit court granted declaratory judgment in favor of WJI, concluding the ballot question failed to meet all the requirements with respect to content and form.  The circuit court, on its own motion, stayed judgment pending appeal.  WEC appealed, and the court of appeals certified the appeal to this court, which we accepted.

## II.  DISCUSSION

¶12  The Wisconsin Constitution provides two mechanisms by which the people may change their founding charter: constitutional convention[3] and constitutional amendment.  This case concerns only the amendment process, which is spelled out in Article XII, Section 1:

> Any amendment or amendments to this constitution may be proposed in either house of the legislature, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published for three months previous to the time of holding such election; and if, in the legislature so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to

---

[3] Wis. Const. art. XII, § 2.

9

submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become part of the constitution; provided, that if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately.

This section was adopted as part of our original constitution in 1848 and has never been amended. Compare Wis. Const. art. XII, § 1 (1848) with Wis. Const. art. XII, § 1 (2021); Ray A. Brown, The Making of the Wisconsin Constitution (Part II), 1952 Wis. L. Rev. 23, 60.

¶13 WJI argues the ballot question for Marsy's Law violated two separate clauses of Article XII, Section 1. First, it contends the proposed amendment was not, in effect, submitted "to the people in such manner and at such time as the legislature shall prescribe." Wis. Const. art. XII, § 1. WJI maintains that this provision requires a ballot question on a proposed amendment to disclose "every essential" of the amendment and not be misleading. Separately, WJI asserts that Marsy's Law constituted "more than one amendment" and therefore voters should have been given the opportunity to "vote for or against such amendments separately." Id.

¶14 Analyzing these questions requires us to interpret the Wisconsin Constitution, and determine if the amendment was ratified in conformance with the constitutional procedures— questions of law we determine independently. Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶28, 393 Wis. 2d 38, 946

10

N.W.2d 35; McConkey, 326 Wis. 2d 1, ¶12.  We begin by reviewing our approach to constitutional interpretation.

### A.  Constitutional Interpretation

¶15  The Wisconsin Constitution begins, "We, the people of Wisconsin, grateful to Almighty God for our freedom, in order to secure its blessings, form a more perfect government, insure domestic tranquility and promote the general welfare, do establish this constitution."  Wis. Const. pmbl.  This reflects the foundational assumption of our system of government:  all authority resides with the people, and it is the people alone who have the authority to establish the terms and methods by which they will be governed.  The constitution is that foundational charter in which the people determine their fundamental law, and by which they consent to be governed.  See Wis. Const. art. I, § 1 (government derives its "just powers from the consent of the governed").

¶16  This contrasts with the constitutional system of the British from whom we declared independence.  While our friends in Great Britain speak of being governed by a "constitution," it is not a written constitution.  Nikolas Bowie, Why the Constitution Was Written Down, 71 Stan. L. Rev. 1397, 1400 (2019).  Rather, for them, it is a set of civic values and norms accepted by the people through the years.  Id.  But that is not

11

how we do it here. Our constitutions——state and federal——are written documents. They are law and should be read as such.[4]

¶17 This foundational point means our authority to interpret the constitution when deciding cases is not without limits. The constitution establishes the entities and institutions that the people have determined will order their lives. Each of our three branches of government——legislative, executive, and judicial——is created by the constitution and subject to it. Vos, 393 Wis. 2d 38, ¶31; League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶30, 387 Wis. 2d 511, 929 N.W.2d 209. The constitution tells the judiciary, no less than any other branch, what we can do, what we must do, and what we cannot do. See generally Wis. Const. art. VII (providing powers, obligations, and prohibitions of various kinds on the judiciary). We must be faithful to the charge we have been given by the people, exercising only the authority entrusted to us. Vos, 393 Wis. 2d 38, ¶¶31-33; see also The Federalist No. 78, at 470 (A. Hamilton) (C. Rossiter ed. 1961) (calling judges the "faithful guardians of the Constitution").

---

[4] See, e.g., U.S. Const. art. VI, cl. 2 (declaring the federal Constitution "the supreme Law of the Land"); The Attainment of Statehood 883 (Milo M. Quaife, ed. 1928) (detailing that the president of the state constitutional convention adjourned the convention in 1848 by remarking, "[t]he result of our labors, if approved, becomes henceforth the supreme law of our adopted land, and whether well or ill done it stands forth as the record of our united opinions upon the form of government best suited to the condition of our people"); Daniel R. Suhr, Interpreting the Wisconsin Constitution, 97 Marq. L. Rev. 93, 93 (2013) (stating the "Wisconsin Constitution is the state's fundamental law").

¶18 The main power we have been given in the constitution is the judicial power, which by necessity means the power to interpret the law in appropriate cases. See Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384. One of our most famous early cases, Attorney General ex rel. Bashford v. Barstow, presented a significant challenge to this court at a time when many questioned our authority to issue orders in a disputed gubernatorial contest. 4 Wis. 567 [*567] (1855). Chief Justice Whiton explained that the legal rights at issue were "fixed by the constitution, and the court, if it has jurisdiction of this proceeding, is the mere instrument provided by the constitution to ascertain and enforce their rights as fixed by that instrument." Id. at 672-73 [*659]. Although the case centered on who the lawful occupant of the governor's office was, the court's role was "the same as in all controversies between party and party; not to create rights, but to ascertain and enforce them." Id. at 673 [*659]. Thus, we have understood from early on that our role is not to use the constitution to create new rights and protections that are not there, but to ascertain and enforce the rights and protections that are already there, fixed by the people in the text of the constitution. See Jacobs v. Major, 139 Wis. 2d 492, 512, 407 N.W.2d 832 (1987) ("Courts would be ill-advised to rewrite history and plain, clear constitutional language to create some new rights contrary to history."). Where our constitution needs updating, the people may do so through

13

constitutional amendment or constitutional convention; that authority has not been given to us.  See Wis. Const. art. XII.

¶19  This should not be surprising because that is exactly how we have described our duty when interpreting other sources of law.  When it comes to statutory interpretation, we understand that it is "a solemn obligation of the judiciary to faithfully give effect to the laws enacted by the legislature, and to do so requires a determination of statutory meaning." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110.  This is why the focus in statutory interpretation is on the language of the statutory text, read reasonably, along with relevant statutory context and structure.  Id., ¶44-46.  The whole goal "of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect."  Id., ¶44.

¶20  Our obligation to be true to the law the people have enacted requires the same kind of consideration of constitutional meaning as we give to statutory meaning.  The awesome responsibility entrusted to us by the people calls us to have the humility and fortitude to say what the law is, not what we may wish it to be.  We do not "update" statutes to fit with the times.  We do not rewrite statutes to account for changing moral norms.  We do not modify statutes so they better accord with our sense of justice or good public policy.  We do not ignore or fail to interpret statutes to mean what they say when critics are loud.  We have repeatedly said it is not our job to judge the wisdom of the laws we interpret; rather, it is our job

14

to interpret the law as we find it. See, e.g., Town of Wilson v. City of Sheboygan, 2020 WI 16, ¶45, 390 Wis. 2d 266, 938 N.W.2d 493 ("The Town's argument that a petitioner should be required to use one method of calculation over another is a policy argument and has no support in the statutory language."); Voters with Facts v. City of Eau Claire, 2018 WI 63, ¶40, 382 Wis. 2d 1, 913 N.W.2d 131 ("[A] court cannot issue a declaration regarding the wisdom of a legislative determination."); Columbus Park Hous. Corp. v. City of Kenosha, 2003 WI 143, ¶34, 267 Wis. 2d 59, 671 N.W.2d 633 ("[W]e must apply the statute as written, not interpret it as we think it should have been written."); Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶57, 237 Wis. 2d 99, 613 N.W.2d 849 ("It is not our role to determine the wisdom or rationale underpinning a particular legislative pronouncement."); Gottlieb v. City of Milwaukee, 33 Wis. 2d 408, 415, 147 N.W.2d 633 (1967) ("We are not concerned with the wisdom of what the legislature has done.").

¶21 Just as the purpose of statutory interpretation is to determine what the statutory text means, the purpose of constitutional interpretation is to determine what the constitutional text meant when it was written, commonly called the original public meaning or original understanding. Although constitutional language is at times written with less precision, that fact does not fundamentally change the nature of our charge. We must similarly focus on the constitutional text, reading it reasonably, in context, and with a view of the provision's place within the constitutional structure. Vos, 393

15

Wis. 2d 38, ¶28. Other sources such as the debates and practices at the time of adoption, along with early legislative enactments, may prove helpful aids to interpretation. State v. Halverson, 2021 WI 7, ¶22, 395 Wis. 2d 385, 953 N.W.2d 847. Just as we leave policy choices to the legislature in statutory interpretation, we must leave policy choices to the people in constitutional interpretation. See Vos, 393 Wis. 2d 38, ¶28 ("The text of the constitution reflects the policy choices of the people, and therefore constitutional interpretation similarly focuses primarily on the language of the constitution."); Flynn v. DOA, 216 Wis. 2d 521, 529, 576 N.W.2d 245 (1998) ("It is for the legislature to make policy choices, ours to judge them based not on our preference but on legal principles and constitutional authority.").

¶22 Although we have not been entirely consistent in its application, we have consistently described our task as one focused on the meaning of the text.[5] For many years, we have commonly recited that when interpreting a constitutional provision, we look to "the plain meaning of the words in the

---

[5] This is also true across the country. "[T]he supermajority of state supreme courts have expressly identified originalism as the primary canon of state constitutional interpretation." Jeremy M. Christiansen, Originalism: The Primary Canon of State Constitutional Interpretation, 15 Geo. J. L. & Pub. Pol'y 341, 344 (2017); see, e.g., Elliott v. State, 824 S.E.2d 265, 268-269 (Ga. 2019); People v. Tanner, 853 N.W.2d 653, 667 (Mich. 2014); Woonsocket Sch. Comm. v. Chafee, 89 A.3d 778, 787 (R.I. 2014); League of Educ. Voters v. State, 295 P.3d 743, 749 (Wash. 2013) (en banc); Commonwealth v. Rose, 81 A.3d 123, 127 (Pa. 2013); State v. Hernandez, 268 P.3d 822, ¶8 (Utah 2011).

context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption."[6] Thompson v. Craney, 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996). Notably, all of these are directed at the original meaning of the constitution.

¶23 This court has doubled down on this approach in recent years.[7] In State v. Roberson, for example, we overruled our

_____

[6] We have——without controversy——embraced this formulation of how we do constitutional interpretation for decades, just as Kalal has taken root as the proper approach to statutory interpretation. See State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110; Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969, 970 (2017) (explaining "Kalal transformed statutory interpretation in Wisconsin" by advancing "a uniform method" for Wisconsin courts to use when interpreting statutes). As a result, the Wisconsin court system has a growing culture where the meaning of the text reigns supreme. And for that, we should be grateful.

Justice Dallet's concurrence, on the other hand, suggests we should depart from a methodology focused on the meaning of the text we are interpreting in favor of a more eclectic and "pluralistic" approach. Justice Dallet concurrence, ¶94. The concurrence's open pining for the freedom to go beyond the meaning of constitutional language must be and is rejected.

[7] Justice Dallet's concurrence tries to marshal cases challenging this. Justice Dallet's concurrence, ¶97. It points to Becker v. Dane County, 2022 WI 63, ¶33, 403 Wis. 2d 424, 977 N.W.2d 390. But the constitutional analysis cited was joined by only three justices and is not an opinion of the court. Justice Dallet's concurrence also cites State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765; State v. Christen, 2021 WI 39, 396 Wis. 2d 705, 958 N.W.2d 746; and Miller v. Carroll, 2020 WI 56, 392 Wis. 2d 49, 944 N.W.2d 542. But those cases involved applying United States Supreme Court precedent on the Second

17

prior decision in State v. Dubose,[8] which had adopted new requirements for the admissibility of out-of-court identification evidence under the Wisconsin Constitution. State v. Roberson, 2019 WI 102, ¶3, 389 Wis. 2d 190, 935 N.W.2d 813. We did so, however, not based on the policies reflected in this decision, but based on our assessment of the "original meaning of the Wisconsin Constitution." Id., ¶44. We recognized that while state constitutions may provide further protection to citizens than the federal Constitution, "the question for a state court is whether its state constitution actually affords greater protection." Id., ¶56. Critically, we held, "A state court does not have the power to write into its state constitution additional protection that is not supported by its text or historical meaning." Id.

---

Amendment and Due Process Clauses of the federal Constitution. The only other example it offers is State v. Knapp, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899, a single decision from 18 years ago that remains controversial for its departure from traditional judicial reasoning and constitutional analysis. See State v. Halverson, 2021 WI 7, ¶38, 395 Wis. 2d 385, 953 N.W.2d 847 (Rebecca Grassl Bradley, J., concurring) ("Because the Knapp court's interpretation of Article I, Section 8 of the Wisconsin Constitution lacks any mooring in text or history, this court should restore the original meaning of this constitutional provision."); Judge Diane S. Sykes, Reflections on the Wisconsin Supreme Court, Hallows Lecture (March 7, 2006), in Marquette Lawyer, Summer/Fall 2006, at 60 ("The court's decision [in Knapp] rests not on the language or history of the state constitution's self-incrimination clause but on the court's own policy judgment flowing from an expansive view of the deterrence rationale of the exclusionary rule.").

[8] State v. Dubose, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, overruled by State v. Roberson, 2019 WI 102, 389 Wis. 2d 190, 935 N.W.2d 813.

18

¶24 In Halverson, a criminal defendant asked us to conclude under the Wisconsin Constitution that an incarcerated individual is "in custody" for purposes of requiring Miranda warnings, despite rejection of that principle under the federal Constitution. 395 Wis. 2d 385, ¶¶2-4. We unanimously rebuffed that argument in part because the defendant provided no argument rooted in the text or history of the Wisconsin Constitution. Id., ¶¶26-28. We did not view the request as a wide-ranging invitation to make new judicial policy on custodial interrogations. Rather, we emphasized that "any argument based on the Wisconsin Constitution must actually be grounded in the Wisconsin Constitution." Id., ¶24

¶25 Likewise, in State ex rel. Kaul v. Prehn, the State asked us to hold that the Governor should have similar removal powers as the President does under the federal Constitution. 2022 WI 50, ¶2, 402 Wis. 2d 539, 976 N.W.2d 821. We rejected the State's overreliance on federal law because the federal cases lent "only limited support to structure, meaning, and original understanding of the Wisconsin Governor's removal power." Id., ¶43. We emphasized that "we focus on the language of the adopted text" when interpreting the constitution, and said it was the State's obligation to present historical research and evidence of the Wisconsin Constitution's "original meaning." Id., ¶¶12, 44. We went on to consult and discuss the original understanding of the appointment powers of the Governor by reference to the historical record, including records of the

19

constitutional convention and early legislative enactments. Id., ¶¶48-51.

¶26 In Johnson v. WEC, we examined the requirements under the Wisconsin Constitution as it related to redrawing legislative maps. 2021 WI 87, ¶2, 399 Wis. 2d 623, 967 N.W.2d 469. In doing so, we reviewed the text and history in search of the "original meaning" of the relevant constitutional provisions. Id., ¶¶28, 33, 58. We rejected, for example, the notion that the Wisconsin Constitution authorizes judicial consideration of partisanship because "[n]othing supports the notion that Article I, Section 1 of the Wisconsin Constitution was originally understood" this way. Id., ¶58.

¶27 When considering our role in constitutional interpretation, Justice Smith said it well in 1855. It is worth quoting at length:

> Let us then look to that constitution, adopted by the people of Wisconsin, and endeavor to ascertain its true intent and meaning, the distribution of the powers of government which it has in fact made, and the agencies which it has provided, whereby those powers are to be executed. And here, let it be remarked, that our conclusions must be guided and determined . . . by the plain, simple, but authoritative and mandatory provisions of our own constitution. We made it ourselves. We are bound to abide by it, until altered, amended or annulled, and we must construe it, and support it, not according to the vague, conjectural hypothesis of volunteer expounders, resident in other states, having no care or interest in the government, and having no knowledge of the constitution of our state, but according to its plain letter and meaning, as the oath-bond of our safety——as the palladium of our rights and liberties—— as the vital principle of our social and political organism.

20

Bashford, 4 Wis. at 785 [*757-58] (Smith, J.).

¶28 In short, our solemn duty in constitutional interpretation is to faithfully discern and apply the constitution as it is written.[9] What the constitution says, it says. What it does not say, it does not say. Through careful, humble, and courageous fidelity to the constitution, we allow the people to govern themselves, we support and uphold the constitutional rights and protections the people have established, and we ensure that the government the people have authorized remains in their hands.

## B. Submitted to the People

¶29 We turn then to the first constitutional challenge WJI poses: Was the proposed amendment submitted to the people in compliance with Article XII, Section 1? Before addressing WJI's several arguments concerning this clause, we begin with the original meaning of Article XII, Section 1.

---

[9] Justice Dallet's concurrence attempts to critique originalism by raising some of the challenges that come with understanding legal texts. Reading the concurrence's near-hopeless description of the interpretive task, one wonders why we bother with a written constitution at all. None of the issues she identifies are unique to constitutional language, however. The same problems inhere in the interpretation of statutes and other legal texts. Laws written by people, sometimes hundreds of years ago, can be difficult to interpret and apply. But this fact does not change the nature of our duty. Thus, the concurrence's broadside against originalism "isn't an attack against originalism so much as it is an attack on written law." Neil Gorsuch, A Republic, If You Can Keep It 113 (2019).

21

### 1. The Original Meaning of Article XII, Section 1 & Ekern

¶30 Our constitutional analysis begins with the text. As relevant to this dispute, following initial adoption in the legislature and other procedural requirements, the constitution requires "the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe." Wis. Const. art. XII, § 1. This language commands only two things: First, the amendment must be "submitted" to the people; and second, it must be done in the manner and at the time prescribed by the legislature. Id. The legislature has enacted Wis. Stat. § 5.64(2),[10] which spells out various instructions for submission such as giving a "concise statement of each question." However, WJI does not develop any separate arguments under this statute. Therefore, we do not address the statute further and focus our attention solely on the requirements in the constitution itself. See Vos, 393 Wis. 2d 38, ¶24 ("We do not step out of our neutral role to

---

[10] Wisconsin Stat. § 5.64(2)(am) states:

There shall be a separate ballot when any proposed constitutional amendment or any other measure or question is submitted to a vote of the people, except as authorized in s. 5.655. The ballot shall give a concise statement of each question in accordance with the act or resolution directing submission in the same form as prescribed by the commission under s. 7.08(1)(a). The question may not be worded in such a manner as to require a negative vote to approve a proposition or an affirmative vote to disapprove a proposition. Unless otherwise expressly provided, this ballot form shall be used at all elections when questions are submitted to a vote of the people.

22

develop or construct arguments for parties; it is up to them to make their case.").

¶31 On its face, the constitutional requirement that an amendment be "submitted" to the people does not contain any explicit obligations regarding form or substance.  The legislature is granted substantial discretion and freedom in how amendments can be submitted to the people.  The text simply requires that the people must have the opportunity to ratify or reject a proposed amendment.

¶32 Moving to other evidence of the original understanding, we are unaware of any ratification debates or other contemporaneous evidence from the constitutional convention that bear on the meaning of this provision.  But early legislative actions pursuant to this provision confirm our reading of the text of Article XII, Section 1.  We look to these early legislative actions not to conclusively settle constitutional meaning, but because they can reveal how a constitutional provision was understood at the time of adoption. See, e.g., Vos, 393 Wis. 2d 38, ¶67.  In other words, early legislatures attempting to amend the constitution are likely to have acted consistent with their understanding of its requirements, and therefore proceed consistent with the original public meaning of Article XII, Section 1.

¶33 In the early years after our constitution was adopted, ballot questions were uniformly submitted as simple up or down votes.  In 1854, the legislature submitted three separate amendments to the voters concerning:  (1) 2-year terms for

23

assemblymen, (2) 4-year terms for senators, and (3) biennial legislative sessions. §§ 1-3, ch. 89, Laws of 1854. The electors were given three ballots:

- "'For amendment to section four' or 'against amendment to section four'";

- "'for amendment to section five' or 'against amendment to section five'"; and

- "'for amendment to section eleven' or 'against amendment to section eleven.'"

§ 4, ch. 89, Laws of 1854. This process confirms that the constitutional command to submit the amendment to the people for ratification was understood not to demand any particular substantive content. It simply required that voters be afforded a clear opportunity to ratify a proposed amendment.

¶34 The pattern continued. In 1862, the legislature submitted to voters an amendment to increase the governor's pay to $2,500 per year. § 1, ch. 202, Laws of 1862. There again, the question on the ballot was simply "for the amendment to the constitution" or "against the amendment to the constitution." § 2, ch. 202, Laws of 1862. In 1867, the people were asked to amend the constitution to increase legislative pay to $350 per year. Ch. 25, Laws of 1867. The question on the ballot once again was "for amendment to the constitution" and "for amendment to the constitution, no." § 2, ch. 25, Laws of 1867. And in 1869, the legislature submitted two amendments to the people to increase the salary of the governor to $5,000 per year and the lieutenant governor to $1,000 per year. Ch. 186, Laws of 1869.

24

The legislature submitted both amendments in the same ballot question: "for amendments to the constitution" and "for amendments to the constitution, no." § 2, ch. 186, Laws of 1869.

¶35 Thus, no ballot question in the first 22 years after the constitution was adopted contained any substantive description of the amendment at all. So far as we can tell, no one questioned the validity of this process. If in fact the constitution requires the content of a proposed amendment to be included in the ballot question, the inescapable conclusion is that every one of these amendments was submitted to the people in an unconstitutional manner——with no one batting an eye. That is highly unlikely. The overwhelming, indeed, uniform teaching of the text and history surrounding Article XII, Section 1 of the Wisconsin Constitution is that an amendment only needs to be submitted to the people for ratification. It need not——as a constitutional prerequisite——contain any kind of description of the amendment's substance.[11]

¶36 This leads to two questions. First, where does the proposed "every essential" test come from, then? And second, are there circumstances under which a proposed amendment can be

---

[11] Justice Dallet's concurrence critiques our interpretive principles because, she argues, originalism is "almost always fruitless." Justice Dallet concurrence, ¶108. But this case stands in direct conflict with those assertions. The original meaning in this case is apparent, with text and history all pointing in the same direction. While some cases may involve harder questions, here, as is often the case, a careful analysis yields a relatively clear answer.

deemed not "submitted" to the people under Article XII, Section 1?  To provide the necessary context for these questions, we continue with a brief survey of the historical practice, legislative changes, and cases that led to the arguments before us today.

¶37  Starting in 1870, the legislature changed its practice and began adding a general subject area to the ballot question, although still without explaining any of the content of the proposed amendment.  Criminal defendants at that time had to be presented to or indicted by a grand jury (absent a few exceptions) before answering a criminal offense.  Wis. Const. art. 1, § 8 (1848).  In 1870, the legislature asked voters to amend the constitution and remove the grand jury requirement. Ch. 118, Laws of 1870.  Voters in favor of the amendment were asked to cast a ballot "against the grand jury system" while those who opposed the proposed amendment voted "for the grand jury system."  § 2, ch. 118, Laws of 1870.  In 1871, voters were asked to add Sections 31 (prohibiting special legislation and private laws) and 32 (authorizing general laws on subject areas prohibited under section 31) to Article IV.  Ch. 122, Laws of 1871.  Those in favor of the amendment were asked to vote "against special legislation" and those opposed to the amendment cast a ballot "for special legislation."  § 2, ch. 122, Laws of 1871.  Along these lines, in 1872, the ballot question asked the people to vote "for amending the constitution increasing the number of justices of the supreme court" or "against amending

the constitution increasing the number of justices of the supreme court." § 2, ch. 111, Laws of 1872.

¶38  1874 saw a longer, more substantive question submitted to the people, immediately followed by a return to ballot questions without subject matter.  The ballot language in 1874 was "for amending the constitution limiting bonded indebtedness by counties, towns, cities and villages, to five per cent" and "against amending the constitution limiting the bonded indebtedness by counties, towns, cities and villages to five per cent." § 2, ch. 37, Laws of 1874.  Following this, however, the legislature again began asking simple yes or no questions.  In 1877 the voters were asked to increase the composition of the supreme court again (the earlier proposal failed).  Ch. 48, Laws of 1877.  The ballot question presented this time was, "for amendment to the constitution" or "for amendment to the constitution, no." § 2, ch. 48, Laws of 1877.  Also that year, the legislature asked the people to amend the provision regarding claims against the state.  Ch. 158, Laws of 1877.  The ballot question simply asked:  "for the amendment" and "against the amendment."  § 2, ch. 158, Laws of 1877.  Other proposed amendments proceeded similarly.[12]

_____

[12] All ballot questions from 1881 until 1897 simply served to identify the section (or sections) amended.  See § 2, ch. 262, Laws of 1881 (amending Article IV, Sections 4, 5, 11, and 21); § 2, ch. 273, Laws of 1882 (amending Article III, Section 1); § 2, ch. 290, Laws of 1882 (amending Article VI, Section 4; Article VII, Section 12; and Article XIII, Section 1); § 2, ch. 362, Laws of 1891 (amending Article IV, Section 31); § 2, ch. 69, Laws of 1897 (amending Article VII, Section 7).  Or they

27

¶39 Then, just before the turn of the century, the legislature adopted a statute that required "a concise statement of the nature" of a proposed amendment. Wis. Stat. ch. 5, § 39 (1898). This mandate was moved in 1907 to the predecessor of what later became today's Wis. Stat. § 5.64. § 2, ch. 583, Laws of 1907 (creating § 38(7)).[13] And in 1908, ballot questions began to include substantive descriptions of proposed amendments. That year, four amendments were submitted to the people. Voters were asked to vote yes or no to the following questions:

- "For the amendment providing state aid in the construction or improvement of public highways." § 2, ch. 238, Laws of 1907.

- "For the amendments authorizing a graduated income tax." § 2, ch. 661, Laws of 1907.

- "For the amendment extending from three to six days the time allowed the governor in which to approve bills." Id.

- "For the amendment providing that after December 1st, 1912, electors shall be citizens of the United States." Id.

And so the trend continued moving forward.

¶40 The first case to address the manner of the legislature's submission to the people occurred in 1925. The question before this court in Ekern was whether the legislature

asked if the voter was for or against an amendment. See § 2, ch. 22, Laws of 1889 (amending Article VII, Section 4).

[13] See § 25, ch. 383, Laws of 1915 (renumbering § 38 to Wis. Stat. § 6.23); § 1, ch. 666, Laws of 1965 (renumbering Wis. Stat. § 6.23 to Wis. Stat. § 5.64).

complied with the constitution when it delegated the drafting of a ballot question to the secretary of state. 187 Wis. at 196-200. We held that this was permissible. Id. at 205. The constitution requires that the legislature determine the "manner" of submission to the people, and we concluded this language was broad enough to encompass directing the secretary of state to determine the content of the ballot question. Id. Although extraneous to the issue in the case, the court engaged in an extended digression regarding the content and design of ballot questions. Id. at 200-02. Because this language is the genesis for the proposed "every essential" test we are asked to breathe life into in this case, we quote the discussion at length and in context:

> A constitutional amendment being designed to affect the fundamental law, the highest degree of care and foresight which the legislature is capable of exercising, in order that the proposed amendment may not fall by the wayside and thus result in thwarting the will of the people, should be exercised as an act of wisdom, and therefore, under the law as it now exists, it would appear to be highly desirable that the form of the question which should be submitted should be prescribed and set forth in the act directing its submission. Every legislature has among its members lawyers who have obtained distinction in their profession and who have made a special study of constitutional law, and ever since the adoption of the constitution it has been the practice of the legislature to appoint such members on the judiciary committees of the two houses. The knowledge, experience, and prudence of such members of the judiciary committee, when supplemented by the aid and advice of the legal department of the state, are liable to result in the production of a better form of submission than if the whole responsibility is rested upon an administrative officer, with the aid of the

29

attorney general alone. But the question raised in the instant case is not one which involves the best method, the greatest wisdom, or the most comprehensive foresight, but whether the general statutes above referred to were adequate to comply with the constitutional provisions; and this depends entirely upon the construction to be placed upon the provision of the fundamental law above quoted on the subject of amendments. Had the framers of the constitution intended that the legislature should prescribe the form, it might easily have done so by using a few additional words, or it might have so worded the provision that the idea of form would have been necessarily included by implication. This, however, was not the case, and it is highly probable that the framers had in mind the vital distinction existing between matters of substance and matters of mere form. Had the legislature in the instant case prescribed the form of submission in a manner which would have failed to present the real question, or had they by error or mistake presented an entirely different question, no claim could be made that the proposed amendment would have been validly enacted. In other words, even if the form is prescribed by the legislature it must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment. This demonstrates quite clearly the fact that the form of submission is after all a mere form, and that the principal and essential criterion consists in the submission of a question or a form which has for its object and purpose an intelligent and comprehensive submission to the people, so that the latter may be fully informed on the subject upon which they are required to exercise a franchise.

Id. (emphasis added).

¶41 Reviewing this discussion, the "every essential" language does not read as a separate test. Rather, it comes as an explanatory statement (phrased as "[i]n other words") for the comment that the real question, not an entirely different question, must be submitted to the people. Therefore, an effort to infuse constitutional significance into this language is not

30

an accurate reading of Ekern on its own terms.  The relevant discussion in Ekern simply does not set forth a substantive, explainable "every essential" test at all.  And why would it? The content of the ballot question was not challenged and was not at issue.  There was no need to create, much less apply, a new substantive constitutional test.

¶42  Therefore, we do not understand Ekern as adopting or creating a new, undefined, and strict constitutional test for detail and accuracy in constitutional amendment ballot questions.  Rather, Ekern's discussion is best read as affirming the unremarkable proposition that the real question of the amendment must be submitted to the people.  This is consistent with the constitutional requirement that a proposed amendment must be "submitted" in order to be validly ratified.  Where a question is not the real question at all, such a proposal cannot be said to be submitted to the people.

¶43  This reading of Ekern animated our decision years later in Thomson, 264 Wis. at 659-60.  Thomson concerned proposed amendments related to legislative apportionment. Id. at 650-51.  The amendments were challenged on the grounds that they should have been submitted as separate amendments——an issue we return to later——and that the ballot question was contrary to the amendment itself.  Id. at 655, 657.

¶44  The ballot question in Thomson stated that, if approved, "the legislature shall apportion senate districts along" certain municipal lines——using mandatory language. Id. at 660.  The problem, we explained, is "the actual

31

amendment . . . has no such mandate at all and under it the legislature is uncontrolled except that the territory inclosed shall be 'contiguous' and 'convenient.'" Id. The question given to the voters was the opposite of what the amendment actually provided. We concluded the question was misinformation and not "in accord with the fact." Id. We cited Ekern and concluded that the "question as actually submitted did not present the real question but by error or mistake presented an entirely different one." Id. Accordingly, there was "no valid submission to or ratification by the people." Id. To this day, Thomson remains the only case in state history where a constitutional amendment was deemed invalid because it was not "submitted" to the people.

¶45 A final case we must address involved the court of appeals' efforts to understand these two prior cases, and what sort of requirement an "every essential" test is. The issue in Metropolitan Milwaukee Ass'n of Commerce, Inc. v. City of Milwaukee was the validity of a municipal ballot question——not a constitutional amendment. 2011 WI App 45, ¶1, 332 Wis. 2d 459, 798 N.W.2d 287. One argument raised was whether municipal ballot questions under Wis. Stat. § 9.20(6) were subject to the "'every essential' element" test. Id., ¶¶10, 12. The court of appeals answered in the negative. Id., ¶13. It began by discussing Ekern, and concluded that in context it was not clear an every essential standard was even being proposed at all, an observation we agree with. Id., ¶22. It then read our decision in Thomson as adopting the "every essential" language into the

32

statutory requirement of a "concise statement"——an issue not before us here.[14] Id., ¶23. But, the court noted, Thomson never had to apply the "every essential" language in its reasoning because of its conclusion the ballot statement was inaccurate. Id. The court of appeals went on to address the municipal ballot issue, ultimately concluding the inclusion of "every essential" of a proposal was not incorporated into municipal ballot questions under the relevant statute. Id., ¶30.

### 2. Takeaways

¶46 So what principles of law can we derive from this discussion?

¶47 First, Article XII, Section 1 does not require any substantive discussion of the amendment in the ballot question submitted to the people. No explanation or summary is constitutionally commanded.

¶48 Second, the constitution requires that the amendment be "submitted" to the people for ratification. We held in Thomson, borrowing language from Ekern, that an amendment has not been "submitted" to the people when the ballot question fails to present the real question or is contrary to the amendment itself. Thomson, 264 Wis. 2d at 660. In other words, voters have not been given the opportunity to vote for or

---

[14] We observe that our decision in State ex rel. Thomson v. Zimmerman never clarified or discussed the legal foundation for an "every essential" analysis. 264 Wis. 644, 60 N.W.2d 416 (1953). Therefore, we question whether Thomson held anything regarding the statutory "concise statement" requirement.

against a proposal when the ballot question is fundamentally counterfactual. When a ballot question is factually inaccurate in a fundamental way, it cannot be said that the amendment was actually submitted to the people for ratification. But given the unique facts of Thomson and the broad authority given to the legislature in the constitution, this requirement is narrow and will be triggered only in rare circumstances.

¶49 Third, this court has never, in a single case, developed or applied an "every essential" test for review of proposed constitutional amendments. Nowhere in our two cases that use this language have we established, defined, or utilized such a test.

¶50 And finally, because it is our solemn obligation to follow the original meaning of the constitution, we will not design, invent, or breathe life into the so-called "every essential" test without a constitutional command to do so.

¶51 Insofar as the content of a proposed ballot question is concerned, the relevant constitutional question is whether the proposed amendment was, at a basic level, submitted to the people for ratification. A ballot question could violate this constitutional requirement only in the rare circumstance that the question is fundamentally counterfactual such that voters were not asked to approve the actual amendment. These principles in hand, we examine WJI's argument that the ballot question at issue here failed to satisfy this constitutional requirement.

### 3.   Applied Here

¶52   Once again, the ballot question submitted to voters for Marsy's Law stated:

> Additional rights of crime victims.   Shall section 9m of article I of the constitution, which gives certain rights to crime victims, be amended to give crime victims additional rights, to require that the rights of crime victims be protected with equal force to the protections afforded the accused while leaving the federal constitutional rights of the accused intact, and to allow crime victims to enforce their rights in court?

2019 Enrolled Joint Resolution 3.   WJI raises several objections to this question.

¶53 First, WJI argues that the ballot question fails because it does not mention the new section creating a constitutional definition of a "victim."   In an amendment of this length and complexity, the legislature had to make choices of what to include and how to phrase it.   We must give significant deference to the legislature in making these choices because the constitution affords the legislature substantial discretion in submitting an amendment to the people.   While the legislature could have decided that more be said, WJI's legal argument depends on its erroneous contention that the constitution demands a more exacting review of the legislature's choices.   It does not.   A constitutional definition of "victim" fits comfortably within the statement that crime victims are given certain or additional rights, as the ballot question states.   Nothing here is fundamentally counterfactual such that voters were not asked to approve the actual amendment.

35

¶54 Second, WJI contends the ballot question failed to correctly capture how the rights of the accused would change. It offers several arguments in this regard. WJI asserts the ballot question is misleading because it requires "that the rights of crime victims will be protected <u>with equal force</u> to the protections afforded the accused," while the text of the amendment says victim rights will "be protected by law in a manner <u>no less vigorous</u> than the protections afforded to the accused." 2019 Enrolled Joint Resolution 3 (emphasis added); Wis. Const. art. I, § 9m(2) (emphasis added). While the parties debate the import of this wording choice, we again emphasize the deference owed to the legislature in explaining the proposal to the people. Minor deficiencies in a summary (and all summaries will, by necessity, be incomplete) do not give rise to the kind of bait-and-switch we struck down in <u>Thomson</u>. This does not rise to the level of a fundamentally counterfactual question such that voters were not asked to approve the actual amendment.

¶55 WJI additionally suggests the ballot question is misleading because the amendment reduces the rights of the accused. Prior to Marsy's Law, Article I, Section 9m stated, "Nothing in this section, or in any statute enacted pursuant to this section, shall limit any right of the accused which may be provided by law." Wis. Const. art. I, § 9m (2017). Marsy's Law struck this sentence and added: "This section is not intended and may not be interpreted to supersede a defendant's federal constitutional rights or to afford party status in a proceeding to any victim." Wis. Const. art. I, § 9m(6); 2019 Enrolled

36

Joint Resolution 3, §§ 1, 5. WJI says the ballot question was misleading because this change in its view could reduce the rights of the accused in some situations, yet voters were told "the federal constitutional rights of the accused" would be left intact. We once again return to the relevant question: the issue is not whether the amendment was explained, but whether it was "submitted" to the people. Nothing in the constitution requires that all components be presented in the ballot question. The constitution leaves the level of detail required to the legislature, which may impose more or less requirements on itself. The failure to raise an issue in a summary or describe it with precision does not amount to the kind of wholesale inaccuracy of Thomson or suggest the amendment was not submitted to the people. This as well does not rise to the level of a fundamentally counterfactual question such that voters were not asked to approve the actual amendment.

¶56 Finally, WJI contends the ballot question is infirm for failing to inform the people that victims can now obtain review of adverse decisions by filing a supervisory writ in this court or the court of appeals. See Wis. Const. art. I, § 9m(4)(b); 2019 Enrolled Joint Resolution 3, § 3. We leave the substantive impact of this change for another day. But WJI's argument again depends on the constitution requiring a level of completeness in a proposed question that simply isn't there. The right to file a supervisory writ is certainly encompassed by the ballot question's statement that crime victims will be given

37

certain rights. Nothing about its absence renders the ballot question even arguably inaccurate.

¶57 For these reasons, the challenges to the form of the ballot question presented to the people of Wisconsin do not succeed. The question approved by voters was not fundamentally counterfactual in any way. The proposed amendment was submitted to the people for ratification, and as far as the challenge before us today is concerned, that is all the constitution requires.

## C. Multiple Amendments

¶58 Finally, WJI argues that the amendment should have been submitted as multiple amendments, rather than one. The relevant constitutional text governing this claim is also found in Article XII, Section 1 of the Wisconsin Constitution. It states, "if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately." Wis. Const. art. XII, § 1.

¶59 The text, plainly read, creates a straightforward requirement: multiple amendments must be submitted separately. The question then becomes, what constitutes more than one amendment?

¶60 Unlike the other claims in this case, this issue is one the court has addressed on several occasions. Our first consideration of the multiple amendments question in Article XII, Section 1 occurred in State ex rel. Hudd v. Timme, 54 Wis. 318, 335, 11 N.W. 785 (1882). There, we carefully

38

considered the text and relevant history to determine the original understanding of this provision.[15] Id. at 335-38.

¶61 Focusing on the language, we explained that there could be only two constructions of this sentence. Id. at 335. "First, it may be construed . . . that every proposition in the shape of an amendment to the constitution, which standing alone changes or abolishes any of its present provisions, or adds any new provision thereto, shall be so drawn that it can be submitted separately, and must be so submitted." Id. Such a reading did not make sense, however. Id. It would "be so narrow as to render it practically impossible to amend the constitution." Id.

¶62 Instead, we adopted the second construction, and concluded that the relevant language must mean that only "amendments which have different objects and purposes in view" must be submitted separately. Id. at 336. We explained, "In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other." Id. The court then confirmed this reading by considering the process utilized in the adoption of earlier amendments. Id. at 337-38. It concluded that its

---

[15] The court in State ex rel. Hudd v. Timme did not use the terminology of originalism to explain its analysis, but that is what it did. 54 Wis. 318, 11 N.W. 785 (1882). The court began with the text, and then proceeded to consider the history to determine how the language was understood when drafted. Id. at 335-38.

reading of the text was the understanding of nearly everyone when earlier amendments were submitted to the people, without objection. Id. at 338.

¶63 We therefore held that the multiple amendment requirement "must be construed to mean amendments which have different objects and purposes in view." Id. at 336. And in "order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other." Id. Our test has remained substantially the same since. See, e.g., Thomson, 264 Wis. at 656 (concluding "that a separate submission was required of the amendment" because it failed to satisfy Hudd's test).

¶64 Our most recent formulation of the test was in McConkey, a case challenging the adoption of Article XIII, Section 13, governing marriage. 326 Wis. 2d 1, ¶1. There, we articulated the test as follows:

> It is within the discretion of the legislature to submit several distinct propositions as one amendment if they relate to the same subject matter and are designed to accomplish one general purpose. The general purpose of an amendment may be deduced from the text of the amendment itself and from the historical context in which the amendment was adopted. And all of the propositions must tend to effect or carry out that purpose.

Id., ¶50 (cleaned up). Applying this test, we concluded a single amendment was appropriate because "the general purpose of the marriage amendment is to preserve the legal status of marriage in Wisconsin as between one man and one woman. Both

40

propositions in the marriage amendment relate to and are connected with this purpose." Id., ¶56.

¶65 The parties do not dispute that this is the governing test. And we see no reason to question the textual and historical analysis done by Hudd and its progeny. Employing this test, we have no difficulty concluding Marsy's Law did not violate the constitutional prohibition on submitting multiple amendments as one. The amendment broadly protects and expands crime victims' rights. This is plain from the text and history of its adoption. In so doing, it amends only Section 9m of Article I. Even if WJI is correct that it will impact those accused of crimes as well (an issue we need not decide), all of the changes relate to the same, general purpose of expanding and protecting the rights of crime victims. All of the propositions are aimed at this goal, and tend to effect or carry this out. We hold that WJI's challenge to Marsy's Law on the ground that it was required to be submitted as separate constitutional amendments fails.

III. CONCLUSION

¶66 Through the Wisconsin Constitution, the people of Wisconsin have given the legislature broad authority to determine how proposed constitutional amendments may be submitted to the people for ratification. WJI argues that the ballot question for Marsy's Law was constitutionally deficient under Article XII, Section 1 on multiple grounds. We disagree. We conclude that the ballot question was not fundamentally

41

counterfactual such that voters were not afforded the opportunity to approve the actual amendment. Rather, Marsy's Law was validly submitted to and ratified by the people of Wisconsin, as the constitution requires. WJI further argues Marsy's Law should have been split into more than one amendment, each receiving a separate vote. However, the constitution did not require that here. We conclude the amendment had the single general purpose of expanding and protecting victims' rights, and all provisions of the proposed amendment furthered this purpose. For these reasons, WJI's constitutional challenges to the ratification of Marsy's Law do not succeed, and we reverse the circuit court's judgment to the contrary.

*By the Court.*—The judgment and order of the circuit court is reversed.

42

¶67  REBECCA GRASSL BRADLEY, J.   *(concurring)*.

> If the judicial power extended to every <u>question</u> under the [C]onstitution it would involve almost every subject proper for legislative discussion and decision . . . .   The division of power . . . could exist no longer, and the other departments would be swallowed up by the judiciary.

John Marshall, Speech (Mar. 7, 1800), <u>reprinted in</u> 4 <u>The Papers of John Marshall</u> 82, 95 (Charles T. Cullen ed., 1984).

¶68 Not every constitutional question falls under the authority of the judiciary to answer:  "Sometimes, . . . 'the law is that the judicial department has no business entertaining [a] claim of unlawfulness——because the question is entrusted to one of the political branches or involves no judicially enforceable rights.'"  <u>Johnson v. Wis. Elections Comm'n</u>, 2021 WI 87, ¶40, 399 Wis. 2d 623, 967 N.W.2d 469 (quoting <u>Rucho v. Common Cause</u>, 588 U.S. __, 139 S. Ct. 2484, 2494 (2019)) (ellipsis and modification in the original).  "The judiciary should not be drawn into deciding issues that are essentially political in nature, exclusively committed by the constitution to another branch of government and not susceptible to judicial management or resolution."  <u>Vincent v. Voight</u>, 2000 WI 93, ¶192, 236 Wis. 2d 588, 614 N.W.2d 388 (Sykes, J., concurring/dissenting).

¶69 I join the majority opinion and write separately to explain why the "every essential" test is incompatible with the political question doctrine.  As the majority holds, whether a ballot question states "every essential" of a proposed amendment is non-cognizable.  Nevertheless, three justices cast themselves

1

as legal writing professors with the power to grade the legislature's work. Justice Rebecca Frank Dallet, joined by Justice Jill J. Karofsky, writes in concurrence to give the legislature's work a passing grade, while Justice Ann Walsh Bradley, in dissent, gives the legislature an F. This court lacks the authority these justices would usurp from the legislature. Cf. Johnson, 399 Wis. 2d 623, ¶45 ("Nothing in the Wisconsin Constitution authorizes this court to recast itself as a redistricting commission[.]").

¶70 The "every essential" test is incompatible with the political question doctrine for at least two reasons. First, Article XII, Section 1 of the Wisconsin Constitution assigns the legislature, not the judiciary, the power to determine the manner by which a proposed amendment is submitted to the people. See id. ¶51 (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)). It states, in relevant part:

> [I]t shall be the duty of the legislature to submit such proposed amendment . . . to the people in such manner and at such time as the legislature shall prescribe; . . . provided, that if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately.[1]

Wis. Const. art. XII, § 1. Self-evidently, while this provision requires the legislature to submit a proposed amendment to the people, it also gives the legislature, not the judiciary, the

---

[1] The Wisconsin Constitution posted on the Wisconsin Historical Society's website places a period before "provided" and capitalizes the P. Wis. Const. art. XI, § 1 (1848), https://content.wisconsinhistory.org/digital/collection/tp/id/71791.

2

power to determine how that submission occurs. The constitution imposes only one textually-expressed limitation on the legislature's power to determine the manner of submission: "if more than one amendment be submitted," the people must be able to vote on each separately. Id. The judiciary does not have the authority to compel the legislature to exercise its power over the manner of submission in a particular way. As explained more thoroughly below, this court possesses the power to determine whether a proposed amendment was even submitted to the people, but such a claim is distinguishable from a complaint about an unartful manner of submission.

¶71 This case accordingly presents a separation of powers issue. As one amicus curiae explains, "[i]f affirmed, the circuit court's decision could force the [l]egislature to use new language that no longer expresses the [l]egislature's desired meaning. . . . [T]he [l]egislature presumptively chose those words for a reason[.]" Challenges to the manner of submission are therefore "beyond the purview of judicial review" because they present purely political questions.

¶72 The desire of Justices Ann Walsh Bradley, Dallet, and Karofsky to entertain these political questions would likely spawn "defensive" ballot question drafting. Cf. Brief for the Wisconsin Legislature as Amicus Curiae Supporting Petitioners, Bartlett v. Evers, 2020 WI 68, 393 Wis. 2d 172, 945 N.W.2d 685 (No. 2019AP1376-OA), 2020 WL 811784 *1 ("Governors of this [s]tate have regularly misused their claimed veto power to rewrite appropriation laws, striking out sentence fragments to

3

create new provisions that the [l]egislature did not enact. To combat this gubernatorial lawmaking, the [l]egislature drafts legislation defensively, removing descriptive language that the [g]overnor could turn into operative text, revising language that would contribute to the clarity of law, changing every 'may not' to 'cannot,' and so on."). The legislature could, for example, quote the proposed amendment verbatim on the ballot, perhaps satisfying the values-based concerns of the aforementioned justices. The Wisconsin Constitution, however, does not impose such a cumbersome requirement.

¶73 Second, the "every essential" test is not a "manageable standard[]" by which the judiciary could objectively evaluate the manner of submission. See Johnson, 399 Wis. 2d 623, ¶39. The judicial power vested in this court by Article VII, Section 2 of the Wisconsin Constitution, like the judicial power vested in the United States Supreme Court, "is the power to act in the manner traditional for English and American courts. One of the most obvious limitations imposed by that requirement is that judicial action must be governed by standard, by rule." See Vieth v. Jubelirer, 541 U.S. 267, 278 (2004) (plurality). These standards and rules must be "'principled, rational, and based upon reasoned distinctions' found in the . . . law[]." Rucho, 139 S. Ct. at 2507 (quoting Vieth, 541 U.S. at 278). Otherwise, "intervening courts——even when proceeding with best intentions——would risk assuming political, not legal, responsibility[.]" Id. 2498-99 (quoting Vieth, 541 U.S. at 307 (Kennedy, J., concurring in the

4

judgment)). Whether a particular characteristic of a proposed amendment is "essential" sounds a lot like the "I know it when I see it" test. See Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). The judiciary, however, must make decisions based on reason, not instinct.

¶74 The lack of manageability can be gleaned by comparing and contrasting Justice Dallet's concurrence to the dissent. Justice Dallet states:

> I conclude that a ballot description, if the legislature chooses to provide one, must accurately summarize the significant changes the proposed amendment would make to the [Wisconsin] Constitution.
>
> . . . .
>
> In this case, the legislature's summary was sufficient and . . . [the proposed amendment] was thus validly submitted to the people. Although . . . [the proposed amendment's challengers] point[] to some of the amendment's particulars that weren't described specifically in the ballot language, . . . a summary always leaves some details out. The legislature's description of . . . [the proposed amendment] is accurate, and the expanded definition of "victim," and arguable changes to the state constitutional rights of the accused and this court's jurisdiction weren't so significant that they needed to be described on the ballot.

Justice Dallet's Concurrence, ¶¶133, 135. At no point does Justice Dallet explain why an "expanded definition of 'victim'" is not "so significant." She also does not explain why "arguable changes to the state constitutional rights of the accused and this court's jurisdiction" are not "so significant." Her analysis is conclusory, and a reasonable person could certainly consider such changes to be significant.

5

¶75 Recognizing the inherent vagueness of the "every essential" test, Justice Dallet "acknowledge[s] . . . that this rule doesn't always provide clear answers." Id., ¶134. In actuality, the "every essential" test is incapable of providing any answers whatsoever. The test is based purely on subjective perception, not objective rule. As Justice Dallet reasons, "[b]ecause a summary . . . will always be incomplete and isn't meant to take the place of the text of a proposed amendment, judgment will always be required. But that is okay. We trust judges to make judgment calls all the time[.]" Id. Her view invites judicial overreach because it is based on the rule of judges rather than the rule of law.

¶76 Embracing a standardless test would empower a single circuit court judge in a single county to toss the results of a statewide election based on little more than subjective predilections. This court would become the final arbiter of every proposed constitutional amendment, without any express grant of constitutional authority to second guess the legislature's work. As the majority notes, only once in Wisconsin's 175-year history has this court declared a proposed amendment was not ratified based on a challenge to the wording of a ballot question——despite the Wisconsin Constitution having been amended nearly 150 times. Majority op., ¶¶1, 5 (citing State ex rel. Thomson v. Zimmerman, 264 Wis. 644, 60 N.W.2d 416 (1953)).

¶77 Justice Dallet is also wrong to suggest her approach is "the only way to preserve both the legislature's authority to

6

specify the manner in which amendments are to be submitted to the people and the right of the people to decide whether to change the [Wisconsin] Constitution." Justice Dallet's Concurrence, ¶134. Several steps must be followed before a proposed amendment even becomes a ballot question, and the people maintain control over the process at every step. Article XII, Section 1 of the Wisconsin Constitution specifies the amendment procedure. As relevant to this case, "a majority of the members elected to each of the two houses [of the legislature]" must vote in favor of a proposed amendment. Wis. Const. art. XII, § 1. Thereafter, "such proposed amendment . . . shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published for three months previous to the time of holding such election[.]" Id. In the next legislative session, which occurs after a legislative election, "a majority of all members elected to each house" must vote in favor of the proposed amendment. Id. The legislature then has a "duty" to "submit" the proposed amendment to the people, although the legislature has the power to "prescribe" the "manner" and "time" of submission. Id. If a majority of people who vote on whether to adopt the proposed amendment approve its adoption, the amendment is ratified. Id. An early treatise on the Wisconsin Constitution explains this "gauntlet" decreases the chance "that a very unwise measure" could succeed. See A.O. Wright, An Exposition of the Constitution of the State of Wisconsin 153 (Revised & Improved

7

ed. 1897). "Ample opportunity is . . . given for discussion[.]" Id. The people, without judicial intervention, can "preserve" their popular sovereignty.

¶78 Similar to Justice Dallet, Justice Ann Walsh Bradley never defines an "essential," instead concluding "[b]y any definition of the word" the ballot question in this case was legally inadequate. Dissent, ¶185. The definition, however, matters a great deal, largely because the difficulty in defining the word demonstrates that judges should not be defining it in the first place.

¶79 Illustrating the problem, the dissent declares, "I do not argue . . . that all components of an amendment [need] be presented in a ballot question. Our precedent establishes, and I would maintain, only that 'every essential' is required." Id., ¶187. Nothing in this judicially conceived test tells us how to distinguish between a mere "component" of a proposed amendment and an "essential." Nor does the dissent. Regardless, as the majority opinion explains, "our precedent" requires no such thing. In its certification of this appeal, the court of appeals noted, "there is little case law examining the 'every essential' test . . . and, in fact, no case law applying this test to a given ballot question." Wis. Just. Initiative, Inc. v. Wis. Elections Comm'n, No. 2020AP2003, unpublished certification, at 3 (Wis. Ct. App. Dec. 21, 2021). The majority explains the suspect origins of the "every essential" test in a nuanced, scholarly manner; in contrast, the dissent simply takes one sentence from a century-old case out of

8

context and runs with it. "[I]t is tempting for a creative court to reach a decision by extorting from precedents something which they do not contain. Once embarked on this path, it is too easy for the court to extend [its] precedents, which were themselves the extensions of others, till, by this accommodating principle, a whole system of law is built up without the authority or interference of the [people]." Bartlett, 393 Wis. 2d 172, ¶202 (Kelly, J., concurring/dissenting) (modifications in the original) (citations and quotation marks omitted).

¶80 Unlike the "every essential" test, the counterfactual test this court adopts is consistent with the text of Article XII, Section 1 of the Wisconsin Constitution and is justiciable. While the legislature has the power to decide the manner by which a proposed amendment is submitted to the people, the legislature has the "duty . . . to submit such proposed amendment[.]" See Wis. Const. art. XII, § 1. That duty is not fulfilled when the ballot question misidentifies the proposed amendment with counterfactual information. A challenge alleging the presence of counterfactual information takes issue not with the "manner" of submission but with whether submission even occurred. See id. Applying the counterfactual test therefore does not usurp the legislature's authority but rather ensures the legislature has fulfilled its constitutional duty.

¶81 The reasoning underlying Justice Dallet's defense of the "every essential" test is difficult to discern and seemingly contradictory. For example, she states: "whether an amendment

9

was submitted to the people always requires courts to analyze whether the manner the legislature prescribed for submission satisfied that constitutional requirement." Justice Dallet's Concurrence, ¶134 n.9. Justice Dallet seems to concede she is in fact proposing judicial review of the manner of submission. She fails to appreciate the fundamental distinction between what the legislature submitted to the people and how the legislature made a submission. In conflating the two, Justice Dallet shows little respect for the constitutional prerogatives of a coordinate branch.

¶82 The counterfactual test is straightforward and capable of judicial review: Did the ballot question contain clearly false information? Whether a statement is true or false is simply a factual determination, and while factual determinations are not always easy, they do not turn on personal beliefs. A factual determination is difficult only to the extent that evidence is lacking or conflicting. In contrast, the "every essential" test is largely indeterminate, even if the evidence is clear, precisely because it requires a judge to form a political opinion.

¶83 Justice Dallet responds that "the majority's approach also requires judgment to determine what questions are 'fundamentally counterfactual.'" Id., ¶134 (quoting majority op., ¶51). She continues, "[a]s the use of the word 'fundamentally' implies, superficially counterfactual ballot questions would pass the majority's test. But the majority offers no principled way of distinguishing between superficially

10

counterfactual and 'fundamentally' counterfactual ballot questions." Id.

¶84 As a preliminary matter, Justice Dallet misunderstands the word "fundamentally." The word merely signals a presumption: if a judge is unsure whether information in a ballot question is counterfactual, the judge should assume it is not. This presumption respects the power the people constitutionally conferred on the legislature and minimizes indeterminacy. As well as Justice Dallet's argument can be understood, she seems to suggest that because the counterfactual test has, as most legal tests do, a degree of indeterminacy when the facts are unclear, any objection to the "every essential" test grounded in that test's indeterminacy is equally applicable to the counterfactual test. Not so.

¶85 Justice Dallet commits the "fallacy of the beard." In the classic book Straight and Crooked Thinking, the author explained:

> [W]e may deny the reality of difference because there is continuous variation between the different things. A very old example illustrates this error. One may throw doubt on the reality of a beard by a process beginning by asking whether a man with one hair on his chin has a beard. The answer is clearly "No." Then one may ask whether with two hairs on his chin a man has a beard. Again the answer must be "No." So again with "three," "four," etc. At no point can our opponent say "Yes," for if he has answered "No" for, let us say, twenty-nine hairs and "Yes" for thirty, it is easy to pour scorn on the suggestion that the difference between twenty-nine and thirty hairs is the difference between not having and having a beard. Yet by this process of adding one hair at a time, we can reach a number of hairs which would undoubtedly make up a beard. The trouble lies in the fact that the difference between a beard and no beard is like the

11

> difference between white and gray in the fact that one can pass by continuous steps from one to the other.
>
> In this argument, the fact of continuous variation has been used to undermine the reality of the difference. Because there is no sharp dividing line, it has been suggested that there is no difference. This is clearly a piece of crooked argument[.]

Robert H. Thouless, Straight and Crooked Thinking 169-70 (2d prtg. 1932). Justice Dallet suggests that determining whether a test is objective is itself a subjective determination and therefore cannot be done properly. Obviously, subjectivity and objectivity exist on a spectrum, just like the colors white and grey. Just as a reasonable person can look at a color and determine whether it is white or grey, a reasonable person can look at a legal test and determine whether it is subjective or objective. No one can seriously question the objectivity of the counterfactual test, even if it may be difficult to apply in some cases (although not in this one), or the subjectivity of the "every essential" test. The former is indeterminate only to the extent a factual determination is impossible, but the latter is indeterminate even when the facts are undisputed. Notably, Justice Dallet never argues the "every essential" test will constrain judges acting in good faith to the same extent as the counterfactual test.

¶86 Justice Dallet mischaracterizes my view of the counterfactual test as "somehow free from subjectivity." Justice Dallet's Concurrence, ¶134 n.10. Justice Dallet struggles to understand that the attributes of perfectly subjective and perfectly objective are opposite ends of a continuum. A test can be deemed subjective or objective without

12

being perfectly so. The counterfactual test is not perfectly objective, nor is recognizing that a man has a beard.

¶87 Unlike the "every essential" test endorsed by three justices, the counterfactual test safeguards democracy by preserving the prerogatives of the people's representatives in the legislature to decide political questions. Three justices would instead supplant the legislature's constitutionally assigned role, arrogate the power to set aside the not-particularly-close results of a lawfully-conducted election, and embrace a judicially invented test never before applied in the history of Wisconsin. None of these justices defines with any particularity the test they propose to determine whether such an undemocratic remedy is warranted, much less identify the source of their authority to impose it. Without elaboration on the "every essential" test, judges are licensed to inject their political will into the analysis, potentially substituting their will for the will of the people.

¶88 Ironically, these justices suggest that if the judiciary is denied the power to discard election results at will, democracy will suffer. Their concerns arise from both a misunderstanding of the constitutional purpose of a ballot question and a distrust of voters. For example, the dissent complains, "[t]hose voters who do not research a proposed amendment beforehand will see the ballot question and only the ballot question prior to casting their votes." Dissent, ¶189. The constitutional purpose of a ballot question, however, is not to educate voters. As indicated by the historical analysis

13

discussed in the majority opinion, a ballot question merely identifies the particular proposed amendment the voters will decide to ratify——or not. Second, as the Wisconsin Elections Commission explains, "[v]oters are expected to review . . . election notices and apprise themselves of public debate, and educate themselves on the substance and implications of a proposed amendment." (Citation omitted.) By analogy, a ballot for President of the United States does not describe the candidates or their platforms. Voters are trusted to inform themselves.

¶89 Alexis de Tocqueville observed, "[s]carcely any political question arises in the United States which is not resolved, sooner or later, into a judicial question." 1 Alexis de Tocqueville, Democracy in America 357 (Francis Bowen ed., Henry Reeve trans., 1863). If true, government by the people would be replaced with judicial supremacy. Because this court rightly refuses to entertain political questions in this case, I respectfully concur.

¶90 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this concurrence.

14

¶91 REBECCA FRANK DALLET, J. *(concurring).* I agree with the majority that Marsy's Law was validly adopted because the amendment complied with Article XII, Section 1's requirements that proposed constitutional amendments be "submit[ted] to the people" and not contain "more than one amendment."[1] See Wis. Const. art. XII, § 1. Evaluating whether Marsy's Law was submitted to the people requires us to balance two competing interests reflected in Article XII, Section 1: (1) the legislature's authority to specify the time and manner in which amendments are to be submitted, and (2) the people's right to evaluate and vote on proposed constitutional amendments. Doing so leads to the conclusion that Marsy's Law was submitted to the people because the summary of the amendment that appeared on the ballot accurately summarized the significant changes the amendment would make to the constitution.

¶92 The majority uses a similar interest-balancing approach, but arrives at a rule that is too narrow. And it does so only after a ten page digression extolling the virtues of originalism, which it then tacitly abandons as futile. Because I reject both originalism and the majority's narrow conception of what it means for a proposed amendment to be submitted to the people, I respectfully concur.

---

[1] Because I agree with the majority that WJI's second claim should be rejected based on our longstanding precedent about multiple amendments, I join ¶¶58-59 and 61-65 of the majority opinion.

1

I

¶93 The majority begins by reviewing what it claims to be "our approach to constitutional interpretation," an approach it says seeks "to determine what the constitutional text meant when it was written, commonly called the original public meaning or original understanding." See majority op., ¶¶14, 21. According to the majority, we have "commonly recited" and "consistently described" this as our approach over "many years." See id., ¶22. Thus, according to the majority, our singular approach to constitutional interpretation is originalism and we must follow it, no matter where it leads. See id. ¶¶21-28 (collecting cases).

¶94 I disagree with these conclusions for three reasons. First, the majority's claim that originalism is somehow our settled approach to constitutional interpretation is incorrect. In fact, many of our recent cases use a more inclusive approach to constitutional interpretation that considers more than merely text and history. Second, the majority's two defenses of originalism——(1) that originalism is simply how we interpret any written law, and (2) that originalism constrains judges to their proper role by providing a basis for decisions different than a judge's personal views——are both unconvincing. In my view, a more pluralistic method is needed to interpret faithfully the Wisconsin Constitution (or the United States Constitution for that matter). Under such an approach text and history of course matter, but so do precedent, context, historical practice and tradition. And third, an earlier court's choice of an

2

interpretive methodology like originalism does not bind later courts to use that same methodology.

A

¶95 Before addressing the majority's unconvincing defenses of originalism and my competing view of how to interpret the Wisconsin Constitution, it's useful first to lay out what the majority means by "originalism," why it is wrong to claim that originalism is our consistent approach to constitutional interpretation, and its arguments for why originalism is required.

¶96 There are a number of different variations on originalism, but all spring from "the following three propositions: (1) the meaning of the constitutional text is fixed at the time of ratification; (2) judges should give that meaning a primary role in constitutional interpretation; and (3) pragmatic modern concerns and consequences are not allowed to trump discoverable original meaning." See Eric J. Segall, Originalism As Faith 8 (2018). The majority agrees with each of these propositions. It says that "our solemn duty in constitutional interpretation is to faithfully discern and apply the constitution as it is written." See majority op., ¶28. To do that, the majority explains we must identify the "original public meaning or original understanding" of the constitutional provision we are interpreting, and apply that original public meaning no matter the consequences. See id., ¶21. In this respect, the majority agrees with most contemporary academic and

judicial originalists who, in a break from their predecessors,[2] also focus on identifying and applying the original public meaning. See, e.g., Antonin Scalia, Originalism: The Lesser Evil, 57 U. Cin. L. Rev. 849, 856 (1989). And although the majority acknowledges that we have not always done so, it argues that our cases have "consistently described our task as one focused on the meaning of the text," and have recently "doubled down on" an approach focused on the original public meaning. See majority op., ¶¶22-23.

¶97 This claim, however, is incorrect. In fact, in a number of recent cases the court has taken a more pluralistic approach to constitutional interpretation that takes into account more than just text and history. See Becker v. Dane County, 2022 WI 63, ¶33, 403 Wis. 2d 424, 977 N.W.2d 390 (lead op.) (rejecting plaintiffs' invitation to revisit our case law regarding the separation of powers to fit better with their account of the original public meaning); State v. Roundtree, 2021 WI 1, ¶¶20-52, 395 Wis. 2d 94, 952 N.W.2d 765 (analyzing the text and history of the Second Amendment along with precedent and empirical evidence about the risks underlying the prohibition on felons possessing firearms); Miller v. Carroll,

---

[2] Earlier originalists tended to focus on the intent of the framers. See Robert Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L.J. 1, 13-14 (1971). But this approach was abandoned in the face of "serious problems" identifying whose views counted, and how to discern intent when the framers' views differed. See Erwin Chemerinsky, Worse Than Nothing: The Dangerous Fallacy of Originalism 17 (2022) (noting, for example, James Madison's and Alexander Hamilton's disagreements about the authority of Congress and the executive branch).

4

2020 WI 56, ¶¶21-35, 392 Wis. 2d 49, 944 N.W.2d 542 (applying United States Supreme Court precedent to conclude that a judge's acceptance of a Facebook friend request created a "serious risk of actual bias" that violated a litigant's Due Process rights); State v. Knapp, 2005 WI 127, ¶¶60-63, 75-83, 285 Wis. 2d 86, 700 N.W.2d 899 (refusing to interpret Article I, Section 8 of the Wisconsin Constitution in lockstep with the Fifth Amendment based on the need to deter intentional Miranda[3] violations). And these decisions and others like them were criticized by some justices as non-originalist, or at least not sufficiently originalist. See, e.g., Becker, 403 Wis. 2d 424, ¶76 (Rebecca Grassl Bradley, J., dissenting) (contending that the original public meaning of the Wisconsin Constitution contradicted the lead opinion and the concurrence's interpretation); Roundtree, 395 Wis. 2d 94, at ¶67 (Rebecca Grassl Bradley, J., dissenting) (asserting that "the majority contravenes the original public meaning of the Second Amendment"); State v. Christen, 2021 WI 39, ¶65, 396 Wis. 2d 705, 958 N.W.2d 746 (Hagedorn, J., concurring) (criticizing the majority's analysis as "insufficiently rooted in the original public meaning of the Second Amendment"); State v. Halverson, 2021 WI 7, ¶45, 395 Wis. 2d 385, 953 N.W.2d 847 (Hagedorn, J., concurring) (arguing that Knapp is "non-textual" and "ahistorical"); Miller, 392 Wis. 2d 49, ¶104 (Hagedorn, J., dissenting) ("Today's decision continues the march away from the original public meaning of our Constitution."). Thus, the majority cannot claim that

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

5

originalism is somehow our consensus approach to constitutional interpretation.

¶98 Setting aside its claim that originalist interpretation is our dominant approach, the majority offers a simple account for why we should embrace its particular brand of originalism. The argument goes like this: We have only the judicial power, "the power to interpret the law in appropriate cases." See majority op., ¶18. And that power is limited to applying the law as it exists, not as we might want it to be. See id. Since the Wisconsin Constitution is written law, it should be interpreted in the same way as other written law, "as we find it." Id., ¶20. The way you do that is by trying to ascertain the constitution's meaning from the text, reading it reasonably, in context, in the way in which it would have been understood by people when it was written. Id., ¶21. That is what we have done in the past, see id., ¶¶22-26, and that is what we should continue to do in order to ensure that we "leave policy choices to the people." Id., ¶21.

¶99 In sum, the majority's defense of originalism rests on two related arguments. First, originalism is simply what we do whenever we read any text; we look at the words, figure out what they meant to people at the time they were written, and apply that meaning. And second, originalism helps separate judicial decisions from the policy views of individual judges and keeps the authority to change the constitution where it belongs, with the people acting through their elected representatives.

6

B

¶100 Both of the majority's arguments for originalism are unconvincing. Its argument that originalism flows directly from the fact that our constitutions are written is circular and thus doesn't support its conclusion. And the argument about constraining judges fails because originalism does not, and cannot, accomplish that goal.

1

¶101 "Our constitutions——state and federal——are written documents," and according to the majority they "should be read as such." Majority op., ¶16. In the majority's view, that means we must "ascertain and enforce the rights and protections that are already there, fixed by the people in the text of the constitution." Id. ¶18. In short, the Wisconsin Constitution was written down, and because it was written down, we have to look for its original public meaning because that's just what it means to interpret written law. See id.

¶102 Although this argument is somewhat common[4] it suffers from a fatal flaw: it assumes its own conclusion. It simply defines "interpretation" as "synonymous with originalist interpretation" and then uses that definition as evidence that only originalist interpretation is permissible. Andrew B. Coan,

---

[4] Indeed, many scholars have asserted that "'our commitment to a written constitution' entails not only judicial review but also an originalist approach to constitutional interpretation." Andrew B. Coan, The Irrelevance of Writtenness in Constitutional Interpretation, 158 U. Pa. L. Rev. 1025, 1027 (2010) (quoting source).

The Irrelevance of Writtenness in Constitutional Interpretation, 158 U. Pa. L. Rev. 1025, 1030 (2010); see also Erwin Chemerinsky, Worse Than Nothing: The Dangerous Fallacy of Originalism 26 (2022) ("[A]rguments from definition aren't arguments at all; they do not defend their conclusion but assume it."). The normative question of how we should interpret the constitution thus remains unanswered.

¶103 The majority's only response is to complain that "one wonders why we bother with a written constitution at all." See majority op., ¶28 n.9. But there are all kinds of reasons why—and none of them require us to be originalists. "For example, one might be committed to a written constitution as a focal point for legal coordination in the manner of the rules of the road; as a flexible framework for common law elaboration; as a locus of normative discourse in a flourishing constitutional culture; or as one of many legitimate ingredients in a pluralistic practice of constitutional adjudication." Coan, supra at 1047. Each of these approaches honors and gives effect to constitutional text. And the fact is, neither the United States nor the Wisconsin constitutions tell us which one we should choose. See Cass R. Sunstein, There Is Nothing That Interpretation Just Is, 30 Const. Commentary 193, 211-12 (2015). (explaining that the Constitution does not "set out the rules for its own interpretation.").

¶104 In making that choice, it's important to remember that "[t]he meaning of the Constitution must be made rather than found, not in the grand (and preposterous) sense that it is

8

entirely up for grabs, but in the more mundane sense that it must be settled by an account of interpretation that it does not itself contain." Id. at 212. In other words, the majority's simplistic description of constitutional interpretation as "faithfully discern[ing] and apply[ing] the constitution as it is written" is worthless. See majority op., ¶28. Sure, sometimes our constitution uses very clear language. It doesn't take anything beyond the constitution's words to know, for example, that someone licensed to practice law in Wisconsin for only four years can't serve as a member of this court. See Wis. Const. art. VII, § 24 (requiring a license to practice law in Wisconsin for "5 years immediately prior to election or appointment"). But you don't need originalism to reach that conclusion, just the text.

¶105 Most of our constitution, by contrast, was written broadly, and for good reasons. Indeed, the Wisconsin Constitution——now the sixth oldest in the nation, see Jack Stark & Steve Miller, The Wisconsin State Constitution 11 (2d ed. 2019)——came about only after a prior, more specific proposed constitution was rejected by the people, largely because it tried to settle too many then-contemporary policy disputes. See Joseph A. Ranney, Wisconsin and the Shaping of American Law 46 (2017). No doubt part of the reason our constitution has endured so long is because its breadth gave the people of our state the room needed to adapt to new problems. See Ray A. Brown, The Making of the Wisconsin Constitution (Part II), 1952 Wis. L. Rev. 23, 63 ("[T]he wisdom, conscious or unconscious, of

9

the founders by concentrating on fundamental outlines and refraining in the main from details, provided the state with a constitution, which . . . has permitted the government to grow and adapt itself to new conditions and new concepts.").

¶106 The breadth and adaptability of our constitution is evident in its many clauses declaring broad principles in general terms. The Wisconsin Constitution contains, for example, a guarantee of "a certain remedy in the law for all injuries, or wrongs," a prohibition against "control of, or interference with, the rights of conscience," and a pronouncement that "[t]he blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles." See Wis. Const. art. I, §§ 9, 18, 22. And our framers recognized that by writing these provisions broadly it would be up to future judges and interpreters to decide what they mean. As the state constitutional convention's president put it, the framers of our constitution sought to declare "those great principles which characterize the age in which we live, and which, under the protection of Heaven, will——nay, must——guard the honor, promote the prosperity, and secure the permanent welfare of our beloved country." The Attainment of Statehood 883 (Milo M. Quaife, ed. 1928). They weren't trying to write specific rules settling difficult questions for all time. Instead, they were——like the framers of the United States Constitution——trying to "provide a political platform wide enough to allow for considerable latitude within which

10

future generations could make their own decisions." See Joseph J. Ellis, The Quartet: Orchestrating the Second American Revolution, 1783-1789, at 219 (2015); see also Jack Balkin, Living Originalism 27 (2011) ("[C]onstitutional framers and ratifiers very often use open-ended language that deliberately delegates questions of application to future interpreters."). Simply observing, as the majority does, that the constitution was written down does not demonstrate that originalism is the best way to make those decisions.

2

¶107 The majority's second defense of originalism——that it constrains judges to their proper role by focusing them on the text and history of the Wisconsin Constitution, which provide a basis for judicial decisions that differ from an individual judge's personal views——also falls flat.

¶108 The central problem with this argument is that the search for original meaning is almost always fruitless. "The reality is that for most provisions, this single understanding [of the original public meaning] did not exist." See Chemerinsky, supra at 56. And this is just as true of the Wisconsin Constitution as it is of the United States Constitution, if not more so. To begin with, there are far fewer sources to draw on in trying to determine what the Wisconsin Constitution meant to the people who drafted and adopted it. There are only a handful of volumes collecting sources regarding the 1846 and 1847-48 conventions and the ratification debates. See The Movement for Statehood, 1845-1846

11

(Milo M. Quaife ed. 1918); The Convention of 1846 (Milo M. Quaife, ed. 1919); The Struggle Over Ratification, 1846-1847 (Milo M. Quaife, ed. 1920); Attainment, supra. And there are a couple of law review articles from the 1940s and 1950s as well, but they review basically the same materials contained in the print volumes. See Ray A. Brown, The Making of the Wisconsin Constitution (Part I), 1949 Wis. L. Rev. 648; Brown, The Making of the Wisconsin Constitution (Part II), supra.

¶109 What even these limited sources reveal is not one single, universally accepted original public meaning of the Wisconsin Constitution. Instead, they demonstrate that the questions that consumed the drafters of the Wisconsin Constitution——whether the document would retain the failed 1846 constitution's provisions prohibiting banking, guaranteeing property rights to married women, and creating an elected judiciary, for example——tell us nothing about how to resolve contemporary cases. See Brown, The Making of the Wisconsin Constitution (Part II), supra at 26; see also generally The Attainment of Statehood, supra. They also show that, when it came to the document's more open-ended provisions, the drafters left little evidence of what they thought these clauses meant. See Brown, The Making of the Wisconsin Constitution (Part I), supra at 689 (noting that although some provisions of the 1846 constitution's bill of rights were "greatly altered before final adoption, there was general agreement as to the provisions which it should contain"); Brown, The Making of the Wisconsin Constitution (Part II), supra at 57 ("The committee in charge

12

of" Article I, the Declaration of Rights, "adopted this article [from the 1846 constitution] without material changes, and so generally accepted were they, that no debate arose on" them). The same is true of many of the constitution's more specific provisions like the one about how to amend the constitution at issue in this case, Article XII, Section 1.  As the majority acknowledges, there is no evidence from the constitutional convention or ratification debates that sheds any light on its meaning.  See majority op., ¶32.

¶110 The majority suggests that when these sources are unclear or silent, early legislative actions can identify the original public meaning of uncertain constitutional provisions. See id.  But that too is inadequate.  First, any effort to identify what early legislative enactments mean about the constitution requires sifting through voluminous materials that often conflict with one another.  Compare Julian Davis Mortenson & Nicholas Bagley, Delegation at the Founding, 121 Colum. L. Rev. 277, 332-66 (2021) (reviewing evidence from early congresses demonstrating that "[t]he nondelegation doctrine simply was not an accepted feature of the constitutional fabric at the time of ratification"), with Ilan Wurman, Nondelegation at the Founding, 130 Yale L.J. 1490, 1494 (2021) (arguing that "[a]lthough the history is messy," it supports a version of the nondelegation doctrine).  Conflicting history means that early legislative enactments are of little use in identifying what the constitution means.  Worse yet, rather than acknowledge these conflicts, courts often cherry-pick historical examples to

13

support their preordained conclusions instead, a practice rightly derided as "law office history." See Chemerinsky, supra at 66; see also, e.g., Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228, 2324 (2022) (Breyer, Sotomayor, & Kagan, JJ., dissenting) (noting that "early law in fact does provide some support for abortion rights" and that the majority's citation to laws adopted after the Fourteenth Amendment was ratified was "convenient . . . , but it is window dressing"). Second, relying on early legislative inaction as evidence of the constitution's original public meaning is particularly problematic. There are all kinds of reasons why an early legislature might not have acted in a manner that is nevertheless constitutionally permissible for a later legislature. See Leah M. Litman, Debunking Antinovelty, 66 Duke L.J. 1407, 1427-29 (2017) (identifying some of these reasons including new factual and legal developments); see also Chemerinsky, supra at 66 ("The absence of a specific practice at a specific time does not mean that those then in power thought the practice was unconstitutional."). Finally, early legislative enactments are "at best weak evidence of original meaning." Gary Lawson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 398 (2002). Although early legislative enactments might reflect what legislators thought the constitution meant, their interpretations might not have been widely held. See id. Moreover, legislators are not "disinterested observers;" they are capable of misinterpreting the constitution or ignoring its meaning entirely when it is politically expedient. See id.;

14

Chemerinsky, supra at 65 (explaining that it is "possible that the Framers wrote the [relevant constitutional provision] in an effort to outlaw the practice, but faced with the political realities of governing they saw no alternative but to engage in the forbidden behavior."). Thus, their actions cannot meaningfully inform our interpretation of what the constitution means.

¶111 In addition to the problems with identifying original public meaning, "[o]ne of the largest difficulties in applying originalism is choosing the level of abstraction at which the original understanding is stated." Chemerinsky, supra at 67. This issue is illustrated by the majority's discussion of early historical practices regarding constitutional amendments. As the majority explains, early legislatures submitted constitutional amendments to the people as simple yes-or-no questions, for the amendment or against the amendment. See majority op., ¶33-34. Accordingly, the language that appeared on the ballot regarding those early amendments didn't describe the substance or intended effect of the proposed amendments at all. See id. ¶35. The legislature moved away from that practice in fits and starts beginning in the 1870s, however, directing that somewhat more descriptive language appear on the ballot during that period. See id. ¶¶37-38. And that practice eventually solidified into a statute requiring that a "concise statement of the nature" of the proposed amendment appear on the ballot. See Wis. Stat. ch. 5, § 39 (1898); see also Wis. Stat. § 5.64 (2021-22).

15

¶112 From this history, the majority derives the principle that "an amendment only needs to be submitted to the people for ratification," no description required. See majority op., ¶35. Fair enough, but at this level of abstraction the majority's purported original public meaning tells us nothing. What about when the legislature does describe an amendment's substance on the ballot? Can the legislature then offer an incomplete description? An inaccurate one? If the purported original public meaning of Article XII, Section 1 doesn't answer those questions for the majority then something else has to.

¶113 Whatever that something is, it's not originalism. That is because, as the preceding discussion demonstrates, what originalism requires judges to identify——a single, objective original public meaning——is something we cannot know. And even if we do somehow identify one original public meaning, like the majority's abstract insight about Article XII, Section 1, it tells us nothing about how to resolve real cases. Without the objective answers it promises, originalism is no constraint on judges at all. Constitutional interpretation is never as simple as just "apply[ing] the constitution as it is written." See majority op., ¶28. That is because the constitution forces us to choose between competing interests all the time, and value-neutral judging is therefore impossible. Take, for example, Article I, Section 11 of the Wisconsin Constitution, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated." What is

16

reasonable when it comes to drone surveillance or searching cell phones isn't dictated by any original understanding. There could never be an "original understanding" on these topics because they were unimaginable at the time our constitution was written. Moreover, evaluating whether a search is "unreasonable" always requires a value judgment, balancing the interests of the government against an invasion of privacy. So too in deciding what it means for a constitutional amendment to be "submit[ted] to the people." See Wis. Const. art. XII, § 1.

¶114 Finally, even if the original public meaning of many provisions of the Wisconsin Constitution were discoverable, applying it would lead to intolerable results. As one scholar said, "[t]he only kind of originalism that is reasonably determinate leads to conclusions that practically no one accepts." David A. Strauss, Can Originalism Be Saved?, 92 B.U. L. Rev. 1161, 1162 (2012). For example, Article I, Section 9 of the Wisconsin Constitution provides that "[e]very person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws." There is no escaping that, as the use of male pronouns demonstrates, the original public meaning of this provision and many others in our original constitution didn't include women. The delegates to the constitutional convention were all men, and as mentioned previously, part of the reason the proposed 1846 constitution

17

was rejected was because it guaranteed a modicum of autonomy to women through its provisions about married women owning property.  See Ranney, supra at 46-47.  Yet we would never say today that, because the original public meaning of this provision didn't include women, women are therefore not entitled to a "remedy in the laws."  Wis. Const. art. I, § 9.  And that's not the only example.  Take Article I, Section 18's guarantee of "[t]he right of every person to worship Almighty God according to the dictates of conscience."  At the 1847-48 convention, a motion to strike the words "Almighty God" on the grounds that the people had the right to worship whomever or whatever they wanted was defeated as "too radical a doctrine for our God-fearing forefathers."  See Brown, The Making of the Wisconsin Constitution (Part II), supra at 57.  Although this supports the conclusion that the original public meaning of Article I, Section 18's guarantee of religious liberty was inapplicable to those who didn't share our founders' belief in "Almighty God," even those who claim to be originalists would not reach such a repellent conclusion today.

3

¶115 In summary, the majority's arguments fail to defend originalism as a theory of constitutional interpretation.  Originalism isn't required merely because the Wisconsin Constitution was written down.  Rather, there are many plausible ways of interpreting the constitution that are both non-originalist and true to the text.  See Coan, supra at 1047.  And originalism doesn't constrain judges by providing objective

18

answers to difficult constitutional questions. See Chemerinsky, supra at 166 ("Originalism fails on its own terms to provide a constraint on judging. It is only a fig leaf allowing a justice to pretend to adhere to a neutral method.") After all, the search for an original public meaning is usually impossible, and even when it's not, leads to useless insights, abhorrent results, or both.

¶116 Many of originalism's most vocal proponents suggest that rejecting it means embracing the rule of "philosopher-king judges [who] swoop down from their marble palace to ordain answers rather than allow the people and their representatives to discuss, debate, and resolve them." Neil Gorsuch, A Republic, If You Can Keep It 113 (2020). The majority takes a similar tack, accusing me of "open[ly] pining for the freedom to go beyond the meaning of constitutional language." See majority op., ¶22 n.6. But this criticism misses the point. The "constitutional language" alone doesn't resolve difficult cases. Constitutional adjudication is and always has been more complicated than that. And for that reason, no theory——originalism or any other——can provide determinate answers to difficult constitutional questions.

¶117 If that is true, then how should we go about interpreting our constitutions? In my view, we should use the same kind of pluralistic approach I have identified previously. See State v. Hoyle, 2023 WI 24, ¶109, 406 Wis. 2d 373, 987 N.W.2d 732 (Dallet, J., dissenting). We should analyze the United States or Wisconsin constitutions' text and history

19

carefully, but we should also be guided by precedent, context, historical practice and tradition, and the need to balance "'the majority's values against the values that should be protected from society's majorities.'" Id. (quoting Chemerinsky, supra at 207).

C

¶118 In closing I note that even if the majority were correct that originalism is our consensus approach to interpreting the Wisconsin Constitution, that approach would nevertheless not be binding in future cases. See majority op., ¶¶22-26. That is because reliance on a particular method of interpretation in one case doesn't bind future courts to use that same method in all future cases.

¶119 We have never said that our methodological choices bind us in future cases even though we have occasionally assumed so in other contexts. For example, State ex rel. Kalal v. Circuit Court for Dane County, 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110 and subsequent cases applying it appear to assume that its statutory-interpretation framework is binding. See Abbe Gluck, The States As Laboratories of Statutory Interpretation: Methodological Consensus and the New Textualism, 119 Yale L.J. 1750, 1800-03 (2010) (noting that "most of [our] court's disputes" about Kalal "are about how [its] framework should be applied, not whether it controls."). But there are good reasons to doubt that assumption. After all, the United States Supreme Court doesn't treat prior methodological choices as binding in either statutory or constitutional cases. Id. at

20

1823 ("The U.S. Supreme Court does not apply methodological stare decisis . . . in the context of articulating binding statutory interpretation frameworks."); Richard H. Fallon, Jr., Constitutional Constraints, 97 Calif. L. Rev. 975, 1013 (2009) ("Although methodological disputes grow heated in some cases, it is striking that in the domain of constitutional adjudication, the justices have seldom exhibited much interest in attempting to bind either themselves or each other, in advance, to the kind of general interpretative approaches that academic theorists champion.").

¶120 There are several likely reasons the Court does not do so. For one thing, abstract, general methodologies like originalism (or Kalal, for that matter) are an awkward fit with stare decisis, which aims to treat like cases alike. See Chad M. Oldfather, Methodological Pluralism and Constitutional Interpretation, 80 Brook. L. Rev. 1, 42-44 (2014). If the choice of originalism in one constitutional case is treated as binding that means all constitutional cases must be decided using originalist methods. But this one-size-fits-all thinking would upend existing precedent because "[a]ny form of originalist analysis with bite . . . would generate unpalatable results when viewed from a contemporary perspective." Id. at 45. For example, Brown v. Board of Education,[5] same sex

_____

[5] 347 U.S. 483 (1954).

21

marriage, virtually all rights of women[6] and racial minorities, and any number of other fundamental rights are difficult, if not impossible, to justify on originalist grounds. See Chemerinsky, supra at 92-114. Because "the Court would be unlikely to find all substantive conclusions generated by a particular methodology palatable," avoiding those results would mean having to abandon the supposedly settled choice of methodology or twisting that method so much that it no longer really applied at all. See Oldfather, supra at 45-46. Safer then not to adopt any binding methodology, except perhaps in determining the application of an already settled constitutional interpretation.[7] See id. at 39-42 (explaining that stare decisis can play a role when it comes to "decision rules," that is, rules that help implement an existing interpretation of the Constitution like

---

[6] Indeed, just last year, the United States Supreme Court concluded that "history and tradition" led to the "clear answer . . . that the Fourteenth Amendment does not protect the right to an abortion." Dobbs, 142 S. Ct. at 2248. But as in District of Columbia v. Heller, 554 U.S. 570 (2008), the history on which the majority relied is contested. See Dobbs, 142 S. Ct. at 2324 (Breyer, Sotomayor, & Kagan, JJ., dissenting) ("[E]mbarrassingly for the majority . . . early law in fact does provide some support for abortion rights."); see also Heller, 554 U.S. at 595 (arguing that the text and history of the Second Amendment supported a constitutional right to possess a gun for self-defense in the home); id. at 640 (Stevens, J., dissenting) (contending that text and history supported the opposite result).

[7] For example, the United States Supreme Court's decision last year in New York State Rifle & Pistol Association v. Bruen, 142 S. Ct. 2111 (2022) explained that "text and history" are the test for whether firearm regulations are permitted by the Second Amendment. Id. at 2127. But in doing so, the Court never said that "text and history" should be the sole test for interpreting every provision of the United States Constitution.

the tiered-scrutiny framework for claims under the Equal Protection Clause).

¶121 For another thing, reasonable judges disagree about the best way to interpret the constitution. If everyone agreed about the appropriate method for interpreting the constitution, or if there were a clear best method, there would be no need to treat methodologies like originalism as binding in future cases——consensus would already accomplish that goal. But even self-professed originalists disagree about how to do originalism, to say nothing of those who believe non-originalist methods are best. See Segall, supra at 123 (explaining that Justice Scalia's and Justice Thomas's "ideologies have nuanced differences such as their use of precedent, tradition, and what evidence counts toward original meaning."). In the face of such disagreements, labeling a particular method of constitutional interpretation as binding precedent cannot force consensus.

¶122 Indeed, disagreement about the proper method of interpreting the Wisconsin Constitution is almost as old as this court. In Borgnis v. Falk Co., 147 Wis. 327, 133 N.W. 209 (1911), two members of the court wrote at length to express their divergent views about the appropriate methods of constitutional interpretation. Chief Justice Winslow, writing for the majority, favored the view that "the changed social, economic, and governmental conditions and ideals of the time . . . must also logically . . . become influential factors in the settlement of problems of construction and interpretation." Id. at 349-50. But Justice Marshall

23

disagreed, asserting that "[i]f the constitution is to efficiently endure, the idea that it is capable of being re-squared, from time to time, to fit new legislative or judicial notions of necessities in præsenti . . . must be combated whenever and wherever advanced." Id. at 375 (Marshall, J., concurring). And that disagreement continues to this day. Compare Hoyle, 406 Wis. 2d 373, ¶¶83-89 (Hagedorn, J., concurring), with id., ¶¶106-09 (Dallet, J., dissenting). We should not pretend that these disagreements are settled merely because four members of the court have, in a few cases, applied a particular method of constitutional interpretation. Such decisions do not conclusively bind this court to originalism any more than Chief Justice Winslow's opinion more than a century ago compels us to reject it.

II

¶123 Turning now to the specific issue in this case, Wisconsin Justice Initiative (WJI) argues that the way in which Marsy's Law was submitted for ratification violated two aspects of Article XII, Section 1, which governs the process by which the legislature may propose amendments to the Wisconsin Constitution. First, WJI asserts that the language that appeared on the ballot describing the proposed amendment was incomplete, inaccurate, or perhaps misleading, and thus the amendment wasn't truly "submit[ted] . . . to the people" for ratification. See Wis. Const. art. XII, § 1. And second, because Marsy's Law affects the rights of crime victims and the accused in different ways, WJI concludes that it is "more than

24

one amendment," and thus should've been submitted to the people separately.  See id.

¶124 I agree with the majority's analysis of why, based on our longstanding precedent about multiple amendments, WJI's second claim should be rejected.  I therefore join ¶¶58-59 and 61-65 of the majority opinion.  I disagree, however, with the majority's explanation of why, despite the issues WJI identifies with the language that appeared on the ballot, Marsy's Law was nonetheless "submit[ted] to the people" as required by Article XII, Section 1.

A

¶125 Amendments to the Wisconsin Constitution may be proposed by the legislature through the process set forth in Article XII, Section 1.  It provides that if a proposed amendment is approved by a majority vote of two consecutive legislatures, "entered on [the legislature's] journals, with the yeas and nays taken thereon," and published for three months prior to the next general election, "it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe."  Wis. Const. art. XII, § 1.  "[I]f more than one amendment [is] submitted" to the people for ratification, each amendment "shall be submitted in such manner that the people may vote for or against such amendments separately."  Id. If a majority of voters approve of the amendment, it becomes part of the constitution.  See id.

25

¶126 The constitution doesn't explain what it means for a proposed amendment to be "submit[ted] . . . to the people." Id. All it says is that the amendment must be submitted "in such manner and at such time as the legislature shall prescribe." Id.

¶127 As discussed previously, for much of the state's early history, the legislature submitted proposed constitutional amendments to the people through simple yes-or-no questions, for the amendment or against the amendment. See majority op., ¶¶33-34. Accordingly, the language that appeared on the ballot regarding those early amendments didn't describe the substance or intended effect of the proposed amendments at all. See id., ¶35. But over time the legislature moved toward the contemporary practice of providing a short description of proposed constitutional amendments on the ballot. See id., ¶¶37-38.

¶128 That move raised a potential problem. Could the legislature direct that the ballot describe a proposed amendment in a way that was fundamentally incomplete, inaccurate, or deceptive? Was such an amendment still "submit[ted] . . . to the people?" See Wis. Const. art. XII, § 1. In State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 200-02, 204 N.W. 803 (1925), this court said no. We explained that if the legislature "prescribed the form of submission in a manner which would have failed to present the real question, or had they by error or mistake presented an entirely different question, no claim could be made that the proposed amendment would have been validly

26

enacted." Id. at 201. That makes sense. If the legislature misleads the people, intentionally or not, about what a proposed constitutional amendment would do, then the question was never truly submitted to them at all.

¶129 Ekern didn't stop there though. In the next sentence, it said "[i]n other words, even if the form is prescribed by the legislature it must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment." Id. WJI seizes on this sentence, arguing that the language the legislature directed appear on the April 2020 general election ballot regarding Marsy's Law fell short of that mark. The ballot read:

> Question 1: "Additional rights of crime victims. Shall section 9m of article I of the constitution, which gives certain rights to crime victims, be amended to give crime victims additional rights, to require that the rights of crime victims be protected with equal force to the protections afforded the accused while leaving the federal constitutional rights of the accused intact, and to allow crime victims to enforce their rights in court?"

2019 Enrolled Joint Res. 3. According to WJI, this language doesn't describe "every essential" of Marsy's Law because it fails to mention that Marsy's Law expanded the definition of "victim," altered the state constitutional rights of the accused, and changed our court's jurisdiction.[8]

¶130 The majority disagrees with WJI's view that Ekern imposed a constitutional requirement that ballot language contain "every essential" of a proposed amendment. See majority

_____

[8] I accept, for purposes of this opinion only, WJI's characterizations of the substantive effects of Marsy's Law.

27

op., ¶49. According to the majority, "the relevant constitutional question is whether the proposed amendment was, at a basic level, submitted to the people for ratification." Id., ¶51. And the majority concludes that the only way in which an amendment could flunk that test is "in the rare circumstance that the question is fundamentally counterfactual such that voters were not asked to approve the actual amendment." Id. Because the ballot language about Marsy's Law does not fit within that narrow category, the majority concludes that the amendment was validly adopted.

¶131 Before getting to why I think the majority's proposed rule is too narrow, it's important to note one thing. Despite the majority's purported allegiance to originalism, this analysis is anything but originalist. The text of Article XII, Section 1 doesn't tell us what it means for an amendment to be "submit[ted] to the people." Indeed, it's plausible to read the text as allowing the legislature to do whatever it wants when it comes to describing constitutional amendments on the ballot. And knowing that early legislatures used to provide no descriptions on the ballot at all doesn't help us answer whether an amendment submitted with a misleading or incomplete description is submitted to the people either.

¶132 Accordingly, to answer that question, the majority engages in precisely the kind of interest balancing that I argued earlier is a necessary part of constitutional interpretation. See supra Part I.B.2. Here, the relevant interests are the legislature's authority, explicit in the

28

constitution, to specify the time and manner in which amendments are to be submitted, and the people's right——also reflected in the constitution——fairly to evaluate and vote on a proposed constitutional amendment.  And we know that no matter what the majority says, it has to be balancing these interests.  That is because the text could plausibly mean that the legislature has carte blanche when it comes to prescribing how constitutional amendments are submitted to the people and all the history tells us is that the legislature doesn't have to describe the contents of proposed amendments at all.  So without saying so, the majority tries to strike an appropriate balance between these interests that preserves both the legislature's discretion and the people's right to decide whether to amend the constitution.

¶133 The problem is that the new rule the majority derives from Ekern and our other cases regarding the submission-to-the-people requirement is still too narrow.  Although the majority is certainly correct that a "fundamentally counterfactual" ballot question doesn't comply with the constitution, that's not the only way to violate the requirement that an amendment be submitted to the people.  See majority op., ¶51.  An amendment that is described in a way that is so incomplete as to be misleading is also not submitted to the people.  For example, if the legislature had described Marsy's Law on the ballot as merely "an amendment to expand the definition of 'victim' contained in Article I, § 9m of the Constitution," that description wouldn't violate the majority's rule.  This statement is accurate, it's not fundamentally counterfactual.

29

But the description would also be misleading because Marsy's Law made many more significant changes to Article I, Section 9m. And if the people voted to adopt the amendment in reliance on such a description, it can't be said that all of those more significant changes were submitted to the people for ratification. This, I think, is what Ekern was referring to when it said the ballot must describe "every essential" of the proposed amendment. See Ekern, 187 Wis. at 201. Thus, I conclude that a ballot description, if the legislature chooses to provide one, must accurately summarize the significant changes the proposed amendment would make to the Constitution.

¶134 I acknowledge, of course, that this rule doesn't always provide clear answers. Because a summary that appears on the ballot will always be incomplete and isn't meant to take the place of the text of a proposed amendment, judgment will always be required. But that is okay. We trust judges to make judgment calls all the time, and doing so in this context is the only way to preserve both the legislature's authority to specify the manner in which amendments are to be submitted to the people and the right of the people to decide whether to change the

constitution.[9] Indeed, the majority's approach also requires judgment to determine what questions are "<u>fundamentally</u> counterfactual." <u>See</u> majority op., ¶51 (emphasis added). As the use of the word "fundamentally" implies, superficially counterfactual ballot questions would pass the majority's test. But the majority offers no principled way of distinguishing between superficially counterfactual and "fundamentally" counterfactual ballot questions.[10]

¶135 In this case, the legislature's summary was sufficient and Marsy's Law was thus validly submitted to the people. Although WJI points to some of the amendment's particulars that weren't described specifically in the ballot language, as I said before, a summary always leaves some details out. The

---

[9] Justice Rebecca Grassl Bradley's concurrence accuses me of committing a logical fallacy while making one of her own. <u>See</u> Justice Rebecca Grassl Bradley's concurrence, ¶85. According to her concurrence, the majority's approach is consistent with the constitution because it identifies whether an amendment was "submitted to the people," while mine is impermissible because it focuses on "the manner of submission." <u>See</u> <u>id.</u> ¶¶69-70. But this is a straw man. Both the majority and I are answering the same question: whether Marsy's Law was "submitted to the people." We just disagree on the meaning of that constitutional requirement. Article XII, Section 1 says that "it shall be the duty of the legislature to submit . . . proposed . . . amendments to the people in such manner . . . as the legislature may prescribe." As this language makes clear, the manner of submission and the submission itself are inextricably intertwined. Thus, deciding whether an amendment was submitted to the people always requires courts to analyze whether the manner the legislature prescribed for submission satisfied that constitutional requirement.

[10] For this reason, Justice Rebecca Grassl Bradley's concurrence is wrong to suggest that the "fundamentally counterfactual" test is somehow free from subjectivity. <u>See</u> Justice Rebecca Grassl Bradley's concurrence, ¶¶82-84.

31

legislature's description of Marsy's Law is accurate, and the expanded definition of "victim," and arguable changes to the state constitutional rights of the accused and this court's jurisdiction weren't so significant that they needed to be described on the ballot. In short, the legislature gave voters the gist of Marsy's Law, and in an accurate way, and that is all that is required. Accordingly, I respectfully concur.

¶136 I am authorized to state that Justice JILL J. KAROFSKY joins this concurrence, and Justice ANN WALSH BRADLEY joins this concurrence with respect to ¶¶93-122.

¶137 BRIAN HAGEDORN, J. *(concurring).* A central feature of the American legal system is the idea that matters once decided should generally remain that way. The default norm is that when an appellate court takes up and decides an issue, its legal determination remains the rule for that court and authoritatively binds lower courts facing the same question. We call this "precedent," and it is a practice that goes back centuries.

¶138 But by necessity, judicial opinions touch on matters beyond the issues in a case. They might describe a prior opinion or legal doctrine tangential to an issue, but not necessary for resolution of the case. The law calls this "dicta." This word comes from the Latin, obiter dictum, which means "something said in passing."[1] So while the reason or rationale for a decision (in Latin, ratio decidendi[2]) constitutes precedent, the other things said by a court do not. This is true even when the court comments on the law.

¶139 In recent years, however, some discussion in Wisconsin has minimized dicta and maximized the effect of the words in judicial opinions. This is problematic for many reasons. I write separately to bring clarity to what this court has and has not said about dicta, and to issue a clarion call to re-embrace

---

[1] Obiter Dictum, Black's Law Dictionary 569 (11th ed. 2019). Dicta is the plural of dictum. Dictum, Black's Law Dictionary 569 (11th ed. 2019).

[2] Ratio Decidendi, Black's Law Dictionary 1514 (11th ed. 2019).

dicta's crucial role in understanding our case-deciding, precedent-setting function.

¶140 Both we and the Wisconsin Court of Appeals largely carry out our case-deciding work through written judicial opinions. We distribute these opinions to the parties, make them available to the public, and print them in reporters that stretch back to before Wisconsin's statehood. While the Wisconsin Reports are filled with sound writing and compelling legal analysis (and, to be sure, some of the other variety), lawyers and lower courts need to know what from these opinions constitutes a rule of decision governing the next case. Is every jot and tittle, stray statement, or tangential footnote binding legal precedent that must be followed faithfully?

¶141 The answer to this question almost always and everywhere is no. While debate continues over where to draw the line in principle and from case to case, the general rule remains that the holding of a case—that is, the legal rationale underlying and necessary to a decision—constitutes precedent. Other discussion, including discussion of legal matters, is non-binding dicta.[3]

---

[3] See, e.g., Central Green Co. v. United States, 531 U.S. 425, 431 (2001); M. Elaine Buccieri, et al., 21 C.J.S. Courts, § 223 ("Dictum is a statement on a matter that is not necessarily involved in the case and is not binding as authority."); Ryan S. Killian, Dicta and the Rule of Law, 2013 Pepp. L. Rev. 1, 8 (2013); Judith M. Stinson, Why Dicta Becomes Holding and Why It Matters, 76 Brook. L. Rev. 219, 223 (2010); David Coale & Wendy Couture, Loud Rules, 34 Pepp. L. Rev. 715, 725 (2007); Michael C. Dorf, Dicta and Article III, 142 U. Pa. L. Rev. 1997, 2000 (1994).

Chief Justice Marshall explained the distinction this way:

¶142 From our earliest days, this court acknowledged and understood the important distinction between the holding of a case and the non-binding dicta contained within it. See, e.g., Stucke v. Milwaukee & Mississippi R.R. Co., 9 Wis. 202, 211 (1859) (explaining a doctrine "rests in mere obiter dicta, without a direct authority in its favor"). We have repeated the unremarkable rule that when we deliberately take up and decide an issue central to the disposition of a case, it is considered precedential. See State v. Picotte, 2003 WI 42, ¶19 n.21, 261 Wis. 2d 249, 661 N.W.2d 381; State v. Kruse, 101 Wis. 2d 387, 392, 305 N.W.2d 85 (1981). But where our opinions addressed tangential matters not central to the question presented, we labeled such statements dictum and recognized that "[t]his court is not bound by its own dicta." Am. Fam. Mut. Ins. Co. v. Shannon, 120 Wis. 2d 560, 565, 356 N.W.2d 175 (1984); see also State v. Sartin, 200 Wis. 2d 47, 60, 546 N.W.2d 449 (1996); State ex rel. Ekern v. Dammann, 215 Wis. 394, 403, 254 N.W. 759

---

It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399-400 (1821).

3

(1934).[4]  Put simply, not every statement in our opinion pages, no matter how peripheral to the issues in the case, constitutes a precedential opinion of the court.

¶143 This practice took a confusing turn in 2010, however. In Zarder v. Humana Ins. Co., we addressed whether the court of appeals may decline to follow a statement in a majority opinion of this court on the grounds that it is dictum.  2010 WI 35, ¶¶50-58, 324 Wis. 2d 325, 782 N.W.2d 682.  The answer, somewhat surprisingly, was no.  Id., ¶58.  This new approach directly contradicted prior statements of this court.  In State v. Koput, for example, we stated it was perfectly appropriate "for the court of appeals or a circuit court to evaluate statements in our opinions on the basis of whether they constitute dictum." 142 Wis. 2d 370, 386 n.12, 418 N.W.2d 804 (1988).  The court of appeals was wrong to think "it was required to give equal weight to every statement in our opinions."  Id.  Nevertheless, in Zarder we concluded that because the court of appeals could not overrule itself (citing Cook v. Cook[5]), "the court of appeals may not dismiss a statement from an opinion by this court by concluding that it is dictum."  324 Wis. 2d 325, ¶58.

---

[4] The Seventh Circuit acknowledged this as well.  Cole v. Young, 817 F.2d 412, 418 (7th Cir. 1987) ("Wisconsin follows the common law rule that dicta——statements of law going beyond the particular facts of the case——do not constitute binding precedent.").

[5] In Cook v. Cook, we declared that the court of appeals could not "overrule, modify or withdraw language from its prior published decisions" even if it believed the prior decision "is erroneous."  208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997).

4

¶144 This portion of Zarder deserves reexamination. Its reasoning was questionable, its foundation was weak, and its consequences have undermined a proper conception of the judicial role. Just because we stated in Cook that the court of appeals cannot overrule itself does not mean it cannot disregard statements that were never binding in the first place. Indeed, the traditional rule is that only the rationale for a decision has precedential effect. See, e.g., Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399-400 (1821); Koput, 142 Wis. 2d at 386-87; Lakeshore Com. Fin. Corp. v. Drobac, 107 Wis. 2d 445, 457-58, 319 N.W.2d 839 (1982). Simply because the rule of decision in a case cannot be ignored does not transform non-binding dictum into binding precedent. Logically, Zarder's conclusion does not follow.

¶145 Furthermore, the Zarder rule itself distorts the law. Let me give an example. When I joined the court of appeals, one of the very first questions that came across my desk was a motion for leave to appeal. Wisconsin Stat. § 808.03(2) spells out three statutory criteria for permissive appeals: "(a) Materially advance the termination of the litigation or clarify further proceedings in the litigation; (b) Protect the petitioner from substantial or irreparable injury; or (c) Clarify an issue of general importance in the administration of justice." But form orders from the court of appeals also cited State v. Webb, 160 Wis. 2d 622, 632, 467 N.W.2d 108 (1991) and stated, "Additionally, before leave to appeal will be granted, the petitioner must show a substantial likelihood of success on

5

the merits of the appeal." While the likelihood of success would likely be relevant, I thought it odd that an additional requirement not listed in the statutes was added to the draft order. So I searched for the answer.

¶146 In a discussion tangential to the issue in Webb, this court identified the three statutory criteria governing the consideration of a motion for leave to appeal, and then said, "The defendant must also show a substantial likelihood of success on the merits." 160 Wis. 2d at 632. In support of this statement, the Webb court cited Wisconsin's Appellate Practice and Procedure treatise. Id. That treatise does not list "substantial likelihood of success" as a separate factor, but notes that it is implicit in the enumerated criterion and is likely to influence a decision by the court of appeals to take a case. See David L. Walther, Patricia L. Grove, & Michael S. Heffernan, Appellate Practice and Procedure in Wisconsin, § 9.2 at 9-2 (1990). Therefore, even though the statute does not establish likelihood of success as a separate factor, the court of appeals felt bound by Webb's offhand remark. It is disturbing that a single inartfully-phrased sentence on a peripheral legal matter can have that much impact. Zarder effectively transformed a stray comment in a supreme court opinion into a de facto statutory amendment——at least insofar as the court of appeals was concerned.

¶147 Moreover, Zarder has led some in the legal community, and even on this court, to suggest we no longer recognize a role for dicta in our opinions. Every description or discussion, in

this view, constitutes a precedential holding of this court. To be sure, Zarder never says this. In fact, Zarder recognizes and describes two divergent definitions of dicta in our cases. See 324 Wis. 2d 325, ¶52 n.19.[6] These two lines of cases discuss how to define dicta, not whether our opinions contain dicta. Id. As far as I am aware, this court has never held——in what would be a dramatic departure from basic norms of American jurisprudence——that the bench and bar must respect every word or discussion in our opinions as precedent.

¶148 Yet for whatever reason, Zarder seems to have distorted how we think about our judicial work-product as well. Perhaps the feeling that everything we do and say must be followed is partially to blame for the increasing length of our opinions. Perhaps it contributes to the seeming itch to address legal matters in our decisions beyond those necessary to resolve a case. Increasingly, we also find ourselves carefully parsing which parts of opinions we "withdraw language" from and which we do not——a practice that does not appear common around the country or at the United States Supreme Court. Furthermore, we have ceased calling language in our own opinions dicta. Indeed, since Zarder, I cannot find any time we explicitly concluded that a portion of our own opinions was nonbinding dicta. Once again, Zarder on its own terms doesn't demand this, nor does it

---

[6] Zarder explains that our cases reflect two definitions of dicta and those cases debate what, beyond the holding, has binding effect on future courts. See Zarder v. Humana Ins. Co., 2010 WI 35, ¶52 n.19, 324 Wis. 2d 325, 782 N.W.2d 682. I do not attempt here to choose sides, but rather, to restart this debate.

7

call into question the existence of dicta as a general matter. But its directional influence casts a long shadow.

¶149 This departure from judicial norms may also reflect an over-inflated sense of our own importance and role in the constitutional order. The judicial role is, at root, a case-deciding function. See Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶31, 393 Wis. 2d 38, 946 N.W.2d 35. And cases are brought by parties whose legal rights and obligations must be determined. Id. Treating the legal rationale for a decision as precedential helps ensure consistency in the application of the law to other parties with similar issues, and gives due respect to the learned members of the judiciary who have come before. But treating as precedential legal discussions or comments not central to deciding a case flips this on its head, and reimagines our opinions as akin to legislation. In effect, it gives this court power to do far more than decide cases, and therefore, makes us likely to transgress our own guardrails—both constitutional and prudential.

¶150 Our opinions are not statutes, they interpret them. Our opinions are not the constitution, they interpret it. Our opinions are explanations of how and why we decided a case a particular way. They are meant to resolve the issue before us and, in so doing, set forth a legal standard that will be applied in other cases. But we don't know what we don't know. We make mistakes and misdescribe things and use imprecise language. Perhaps a little judicial modesty is in order. Stray statements or tangential discussions in opinions should not bind

future courts or demand a stare decisis analysis. Recognizing dicta serves as a check on the current court, and keeps us in our proper case-deciding constitutional lane. We should embrace it. We should employ it. And neither we nor lower courts should feel compelled to bow before every prior pen-stroke in our opinions.

¶151 So why raise this now? Because these concepts would be beneficial in cases like this. Here, the parties ask us to breathe life into Ekern's statement that "even if the form is prescribed by the legislature it must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment." State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 201, 204 N.W. 803 (1925). But this statement in Ekern was not necessary to the issue decided in that case, which was whether the content of a ballot question may be delegated to the secretary of state. Id. at 196-200. In other words, this is classic dicta. Unfortunately, the parties argued the case as if we are obligated to do something with this language. But we are not. The premise is incorrect. The tangential discussion in Ekern may have persuasive value, but it did not create a judicial test we are bound to apply forevermore. We should call it dicta and call it a day, leaving us to focus on the requirements found in Article XII, Section 1 of the Wisconsin Constitution. That approach is appropriate here, and will be useful and appropriate in cases moving forward.

¶152 I am authorized to state that Justice REBECCA FRANK DALLET joins this concurrence with respect to ¶¶137-150.

9

¶153 ANN WALSH BRADLEY, J. *(dissenting).* Ballot question challenges have been few and far between in the history of our state. Such a challenge reached this court in State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 204 N.W. 803 (1925). There, the court established a test for our review of a ballot question challenge: "it must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment." Id. at 201 (emphasis added).

¶154 Yet rather than respecting the precedent of a nearly century-old unanimous opinion, the majority charts a new course not requested by either party. Instead of applying the test established in Ekern, the majority conjures its own test, never before stated, much less applied.

¶155 Specifically, the majority sets forth that "[a] ballot question could violate [the] constitutional requirement only in the rare circumstance that the question is fundamentally counterfactual such that voters were not asked to approve the actual amendment." Majority op., ¶51. In addition to being created by the majority from whole cloth, this new test is unnecessary for the simple reason that we already have a test from Ekern.

¶156 The majority arrives at its newly discovered test by tossing precedent to the wind and engaging in an unconvincing search for the "original meaning" of the state constitution's command that the legislature "submit" a proposed amendment to the people. As Justice Dallet's concurrence aptly explains, the

1

endeavor of divining the "original meaning" of a constitutional provision is largely a futile endeavor.[1]

¶157 But even setting this aside, the majority's analysis rests on an infirm foundation. It erroneously dismisses the Ekern test, and instead creates and applies a newly-minted test, resulting in an overly permissive approach that risks giving the legislature carte blanche in crafting ballot questions.

¶158 I would follow our precedent set forth in Ekern. Applying the Ekern framework, I determine instead that the ballot question here failed to convey "every essential" of the amendment as is required. From the ballot question only, voters would have no idea that the proposed amendment diminishes the rights of criminal defendants in addition to bolstering the rights of crime victims. In my view, the diminution of a defendant's rights previously protected by law, constitutes an "essential" element of the amendment. Because the ballot question failed to accurately represent an essential element of the law to the voters who approved it, I respectfully dissent.

I

¶159 At the April 7, 2020 election, voters were presented with a yes or no vote on an amendment to Article I, § 9m of the Wisconsin Constitution.[2] This section of the constitution addresses the rights of victims of crime, and the amendment sought to expand the rights to which crime victims are entitled.

---

[1] I join part I of Justice Dallet's concurrence.

[2] As the majority observes, this amendment is informally known as "Marsy's Law." Majority op., ¶10.

2

¶160 When the amendment was presented to voters, the ballot question gave no hint that a defendant's rights were being diminished. It stated:

> Shall section 9m of article I of the constitution, which gives certain rights to crime victims, be amended to give crime victims additional rights, to require that the rights of crime victims be protected with equal force to the protections afforded the accused while leaving the federal constitutional rights of the accused intact, and to allow crime victims to enforce their rights in court?

Majority op., ¶10.

¶161 The Wisconsin Justice Initiative (WJI) brought this suit, asserting that the ballot question failed to satisfy the requirements set forth in the state constitution for distilling a constitutional amendment down to a ballot question that is then presented to the voters. Id., ¶11. At the outset, it should be emphasized that the substance of the amendment is not at issue, except to the extent that the court must determine whether the ballot question accurately represented the substance of the law to the voters who approved it.

¶162 In the course of tackling the question that now comes before us, the circuit court found several shortcomings with the above language. Among the shortcomings, it determined that "the single question presented to the voters was insufficient because

3

it did not reference the effect on the existing constitutional rights of the accused."[3]

¶163 The circuit court stayed its ruling pending appeal, and the court of appeals certified WEC's appeal to this court. Now, the majority reverses the circuit court.

¶164 Purportedly grounding its determination in the constitution's "original meaning," the majority turns its back on Ekern, seeing only a requirement that the legislature "submit" the proposed amendment to the people. Majority op., ¶5. Applying such an understanding, the majority concludes that "the question was not fundamentally counterfactual such that voters were not afforded the opportunity to approve the actual amendment" and was thus permissible. Id. The upshot is that "absent challenge on other grounds, the amendment has been validly ratified and is part of the Wisconsin Constitution." Id., ¶7.

---

[3] The circuit court additionally determined that the question "did not accurately correspond to the language in the proposed amendments regarding the standard 'no less vigorous'" and that the amendment required two ballot questions rather than a single question "because the portion of the amendments that affected the rights of the accused did not sufficiently relate to the principal purpose behind the changes being driven by Marsy's Law to create rights for crime victims."

Because I determine the ballot question to fail the "every essential" test, I need not address these additional bases for the circuit court's decision.

4

II

¶165 I begin by setting forth the guiding principles in reviewing a ballot question. Subsequently, I address the majority's errors.

¶166 It is true that the legislature has a fair amount of discretion in constructing a ballot question. McConkey v. Van Hollen, 2010 WI 57, ¶40, 326 Wis. 2d 1, 783 N.W.2d 855. Indeed, this court has stated that the amount of discretion granted to the legislature is "considerable." Id.

¶167 According to the state constitution, "it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe." Wis. Const. art. XII, § 1. "Article XII, sec. 1 expressly delegates to the legislature the authority to determine the method for placing proposed constitutional amendments before the people." Milwaukee All. Against Racist and Political Repression v. Elections Bd., 106 Wis. 2d 593, 603, 317 N.W.2d 420 (1982). "The inquiry is 'whether the legislature in the formation of the question acted reasonably and within their constitutional grant of authority and discretion.'" McConkey, 326 Wis. 2d 1, ¶40 (quoting Milwaukee All., 106 Wis. 2d at 604).

¶168 The legislature's discretion is broad, but it is not unlimited. In accordance with the constitution ("in such manner and at such time as the legislature shall prescribe"), statutory constraints on the legislature's authority indicate that the ballot question "shall include a complete statement of the

5

referendum question upon which the voters shall be requested to vote." Wis. Stat. § 13.175.[4] Wisconsin Stat. § 5.64(2)(am) provides further guidance on what must be included in a ballot question, requiring a "concise statement" and setting forth additional requirements:

> There shall be a separate ballot when any proposed constitutional amendment or any other measure or question is submitted to a vote of the people, except as authorized in s. 5.655. The ballot shall give a concise statement of each question in accordance with the act or resolution directing submission in the same form as prescribed by the commission under s. 7.08(1)(a). The question may not be worded in such a manner as to require a negative vote to approve a proposition or an affirmative vote to disapprove a proposition. Unless otherwise expressly provided, this ballot form shall be used at all elections when questions are submitted to a vote of the people.

Wis. Stat. § 5.64(2)(am).

¶169 As stated, this court has also previously set forth a test for reviewing a ballot question challenge, providing that a ballot question violates the constitution when it "fail[s] to present the real question" or "present[s] an entirely different question." Ekern, 187 Wis. at 201. "In other words, even if the form is prescribed by the Legislature, it must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment." Id. (emphasis added).

---

[4] As the majority correctly observes, no argument was raised here regarding the legislature's compliance with its statutory obligations. See majority op., ¶3.

6

III

A

¶170 The root of the majority's error lies in its hasty dismissal of the Ekern test.

¶171 This court in Ekern set forth what the parties refer to as the "every essential" test. It requires that a ballot question "must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment." Ekern, 187 Wis. at 201. As the court of appeals observes in its certification in the present case, this court has not expanded on what it really means for a ballot question to include "every essential" and this case presents an opportunity for the court to explain and apply this court's statement in Ekern. See Wis. Just. Initiative v. Wis. Elections Comm'n, No. 2020AP2003, unpublished certification, at 3 (Dec. 21, 2021).

¶172 But instead of taking that opportunity, the majority simply dispenses with Ekern. In the majority's view, the "every essential" test is no test at all, but is instead just an "explanatory statement."[5] Majority op., ¶41. Such a

---

[5] Justice Hagedorn's concurrence goes a step further, asserting that the "every essential" test is mere dicta. Such an approach runs counter to the thrust of our recent jurisprudence. See Teigen v. Wis. Elections Comm'n, 2022 WI 64, ¶139 n.8, 403 Wis. 2d 607, 976 N.W.2d 519 (Rebecca Grassl Bradley, J., concurring) (explaining that "[o]ur court does not recognize the concept of dicta").

This approach to dicta has been recognized to be simple and clear. It does not require the reader to dissect an opinion to determine, under whatever definition of dicta is embraced, what is and is not "necessary" or "germane" to the holding. See Justice Hagedorn's concurrence, ¶147.

7

characterization would be news to the court in <u>State ex rel.</u> <u>Thomson v. Zimmerman</u>, 264 Wis. 644, 659, 60 N.W.2d 416 (1953), who noted (although did not decide) a controversy over whether a ballot question "fairly comprised every essential of the amendment." And it most certainly is news to the parties here, who both argued their positions in terms of the "every essential" framework <u>Ekern</u> set forth.

¶173 By dismissing the "every essential" test of <u>Ekern</u>, the majority is able to avoid an exacting stare decisis analysis in order to determine if it should be overruled. <u>See</u> <u>Johnson</u> <u>Controls, Inc. v. Emps. Ins. of Wausau</u>, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. Instead of analyzing whether a "special justification," <u>see</u> <u>Hinrichs v. DOW Chem. Co.</u>, 2020 WI 2, ¶¶67-68, 389 Wis. 2d 669, 937 N.W.2d 37, is present that would compel <u>Ekern</u> to be overruled, the majority relies on the convenient and outcome-determinative hypothesis that the relevant language is not actually the "test" the parties think it is.

---

Such an approach also fosters consistency and predictability. "As the distinction between holding and dicta becomes increasingly vague, past precedents can be increasingly manipulated . . . [by] offer[ing] some facially plausible argument for disregarding a statement in a prior case." Michael Abramowicz & Maxwell Stearns, <u>Defining Dicta</u>, 57 Stan. L. Rev. 953, 1024 (2005). Therefore, "loose and unpredictable standards for determining whether a statement is dicta can undermine stare decisis and the principles of judicial restraint." <u>Est. of</u> <u>Genrich v. OHIC Ins. Co.</u>, 2009 WI 67, ¶83, 318 Wis. 2d 553, 769 N.W.2d 481 (Ann Walsh Bradley, J., concurring in part and dissenting in part).

8

¶174 Of note is that no party here asked us to overrule Ekern.[6] See St. Augustine Sch. v. Taylor, 2021 WI 70, ¶37, 398 Wis. 2d 92, 961 N.W.2d 635 (observing that "no party asked us to overrule either" of two cases and declining to "overrule or revisit either case on our own initiative"). Indeed, WEC argued within the confines of Ekern that the ballot question at issue provided "every essential" of the amendment. We have thus been provided no special justification for overruling Ekern. As such, I would maintain the Ekern test. Doing so not only respects the precedent established by the courts who came before us, but in this case furthers the aims of democratic governance. Making sure that a ballot question includes "every essential" of an amendment ensures that the public is informed and can "vote intelligently." Ekern, 187 Wis. at 204. This is critical to maintaining a democracy.

¶175 The result of the majority's error is an overly permissive approach that risks giving the legislature carte blanche in crafting ballot questions. The potential for a ballot question to mislead the public leads me to believe that a more exacting standard is necessary. Ekern's "every essential" test provides more of a safeguard, enhancing the sacred right to vote, than does the majority's proffered new test.

¶176 When a ballot question fails to accurately describe "every essential" of a corresponding constitutional amendment, the people have not spoken on the true question. Rather than

---

[6] WEC confirmed at oral argument that it was not asking for this court to overturn "any of its prior decisions."

9

heralding that "the people have spoken" through their votes, instead the people are misled and democracy is undermined. Accordingly, I would maintain a test that provides more of a safeguard against such an outcome. The established Ekern test fits the bill.

B

¶177 Applying the Ekern test to the ballot question at issue here, I determine that the ballot question fails to inform voters of "every essential" of the amendment.

¶178 It is true that our previous cases offer precious little guidance in what it means to inform voters of "every essential." Indeed, challenges to ballot questions are rare in our jurisprudence, and when they are challenged the attack is often leveled on other grounds. See, e.g., McConkey, 326 Wis. 2d 1, ¶4 (addressing a challenge under the "separate amendment rule").

¶179 As observed above, both parties here framed their arguments in terms of the Ekern test, and their arguments provide us with some guideposts as to the contours of the inquiry. WEC proposes the following understanding: "this Court should hold that the 'every essential' standard requires that the Legislature 'fairly express' the 'clear and essential purpose' of the proposed amendment in the ballot question." For support, WEC points us to Minnesota law applying a similar standard. See Breza v. Kiffmeyer, 723 N.W.2d 633, 636 (Minn. 2006).

10

¶180 In contrast, WJI cites language in Ekern itself as providing the operative standard: "It is clear and unambiguous, so as to enable voters to vote intelligently." Ekern, 187 Wis. at 204. "[T]he principal and essential criterion consists in a submission of a question or a form which has for its object and purpose an intelligent and comprehensive submission to the people, so that the latter may be fully informed on the subject upon which they are required to exercise a franchise." Id. at 201-02; Thomson, 264 Wis. at 659.

¶181 Under either formulation, the ballot question here fails. I begin my analysis with the essential fact, recognized by the circuit court, that the victim's rights amendment does more than just increase the rights of crime victims. The majority fails to acknowledge this. Instead, it opines: "all of the provisions of Marsy's Law relate to expanding and defining victim's rights and tend to effect and carry out this general purpose." Majority op., ¶6.

¶182 Several provisions of the amendment do, in fact, decrease the rights afforded to criminal defendants. For example, the amendment limits the rights of criminal defendants in the following ways:

- Where the previous version of § 9m stated that "[n]othing in this section, or in any statute enacted pursuant to this section, shall limit any right of the accused which may be provided by law," the new version protects only the federal constitutional rights of the defendant, not the broader protection of "any

11

right . . . provided by law." The change allows for a limitation of the defendant's rights that are provided by statute, or by the Wisconsin Constitution, which may afford greater protections than its federal counterpart. See State v. Eason, 2001 WI 98, ¶60, 245 Wis. 2d 206, 629 N.W.2d 625.

- The amendment adversely impacts the defendant's ability to obtain discovery, giving victims the constitutional right "[t]o refuse an interview, deposition, or other discovery request made by the accused or any person acting on behalf of the accused." Wis. Const. art. I, § 9m(2)(L).

- The circuit court's ability to sequester a victim witness where "sequestration is necessary to a fair trial for the defendant" has been removed.

¶183 The new language that allows a victim to essentially refuse interviews and discovery requests would certainly seem to have a detrimental effect on the rights of the accused. Similarly, the previous constitutional language allowed a circuit court to sequester a victim from the courtroom to preserve the fair trial right of the defendant. This right is now gone.

¶184 Shouldn't the voters be informed that a constitutional amendment diminishes the rights of criminal defendants before voting on it? In light of these provisions, it is apparent that the amendment serves dual "purposes," both expanding the rights of victims and diminishing those of the accused.

12

¶185 By any definition of the word, such a change is an "essential" aspect of an amendment. Accordingly, a voter would need to be informed of the change before voting "intelligently." Its lack of inclusion has the significant potential to mislead voters as to the consequences of their votes.

¶186 The majority tersely disposes of this argument within the span of a single paragraph. See majority op., ¶55. It does so with a one-two punch, first setting up a false dichotomy followed closely by a strawman. To explain, the majority directs the reader not to the question of "whether the amendment was explained, but whether it was 'submitted' to the people." Id. Yet according to the majority, if an amendment is not properly explained (i.e., it is "fundamentally counterfactual"), that does not constitute "submission." In other words, an examination of the "explanation" offered is not irrelevant to the "submission" question, but is instead part and parcel of such a determination.

¶187 Next, the majority advances that "[n]othing in the constitution requires that all components be presented in the ballot question." Id. This is a strawman. I do not argue, and I do not understand any of the parties to be arguing, that all components of an amendment be presented in a ballot question. Our precedent establishes, and I maintain, that only "every essential" is required.

¶188 When an amendment to the state constitution is placed before the voters for an up or down vote, it is imperative that the voters know what they are voting on. It can be a difficult

13

exercise to distill a complex and multifaceted constitutional amendment down to a simple description that will fit on the ballot, yet still informs voters of the true nature of the question.

¶189 Nevertheless, the ballot question is the only text that all voters are guaranteed to see. See Craig M. Burnett & Vladimir Kogan, When Does Ballot Language Influence Voter Choices? Evidence from a Survey Experiment, 32 Pol. Commc'n 109, 112 (2015). Those voters who do not research a proposed amendment beforehand will see the ballot question, and only the ballot question, prior to casting their vote. This gives the framing provided by the ballot question considerable power in shaping how voters think about and understand the question presented.

¶190 That ballot question language possesses this power to frame the issue in turn dictates that the language provide an accurate picture of the measure that is placed before the voters. To this end, we should maintain the vitality of judicial review in the ballot question context, rather than essentially surrendering our responsibility for judicial review to the legislature. Democracy works best when voters are fully informed. The majority opinion takes a step backward in this endeavor.

¶191 For the foregoing reasons, I respectfully dissent.

14